

**20 CV 6141**

*FPG*

Revised 03/06 WDNY

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NEW YORK

## FORM TO BE USED IN FILING A CIVIL COMPLAINT IN FEDERAL COURT
### (Non-Prisoner Context)

All material filed in this Court is now available via the **INTERNET**. See **Pro Se Privacy Notice** for further information.

## 1. CAPTION OF ACTION

**A.    Full Name of Plaintiff:** NOTE: *If more than one plaintiff files this action and seeks in forma pauperis status, each plaintiff must submit an in forma pauperis application or the only plaintiff to be considered will be the plaintiff who filed an application.*

MICHAEL BONANO, ET AL.
(SEE ATTACHED TYPEWRITTEN "LIST OF PLAINTIFFS", ATTACHED, FOR ALL PLAINTIFFS)

-vs-

**B.    Full Name(s) of Defendant(s)** NOTE: *Pursuant to Fed.R.Civ.P. 10(a), the names of all parties must appear in the caption. The court may not consider a claim against anyone not identified in this section as a defendant.* Add a separate sheet, if necessary.

1. RYAN W. HICKEY
2. SHANNAN KRASNOKUTSKI
3. MARK SWEENEY
4. TED O'BRIEN
5. ANTHONY J. ANNUCCI
6. STEPHEN J. MAHER

(SEE ATTACHED FOR ALL 51 DEFENDANTS)

## 2. STATEMENT OF JURISDICTION, VENUE and NATURE OF SUIT
### *All of these sections MUST be answered*

*Identify the basis for federal Court jurisdiction over your claim, such as that the United States government is a party to the action, all the parties reside in different states and therefore you claim diversity jurisdiction, or the claim presents a federal question or arises under federal law.*

A. Basis of Jurisdiction in Federal Court: 18 U.S.C. § 1961, ET SEQ., ESP. 18 U.S.C. § 1965(a)
28 U.S.C. §§ 1331 & 1343 (3) & (4); 28 U.S.C. §§ 1391 & 2201; ALSO U.S. CONST., ART. III
(SEE ATTACHED PAGES FOR FULLER EXPLANATION)

*State why the Western District of New York is the proper venue for this action, such as that your claim arises in or the defendant resides in the 17 westernmost counties of New York State.*

B. Reason for Venue in the Western District: VIRTUALLY ALL OF THE UNCONSTITUTIONAL, CONSPIRATORIAL
ACTS, INCLUDING NUMEROUS WIRE FRAUDS, WERE PERPETRATED AGAINST PLAINTIFF BY
DEFENDANTS AS HE WAS IMPRISONED FALSELY IN FACILITIES W/IN THIS COURT'S GEOGRAPHIC JURISDICTION

*Identify the nature of this action, such as that it is a civil rights claim, a personal injury or personal property (tort) claim, a property rights claim, or whatever it is.*

C. Nature of Suit: A R.I.C.O. CIVIL SUIT AGAINST DOZENS OF BAD STATE ACTORS WHO
DIRECTLY AND INTENTIONALLY CONTRIBUTED TO MAINTAINING FALSE IMPRISONMENT FROM
FEB 21, 2017 THROUGH JUNE 27, 2019, DESTROYING ECONOMIC OPPORTUNITIES AND
DELAYING OTHERS I WOULD HAVE OTHERWISE ENJOYED. SAID ACTS ENCOMPASS NUMEROUS
VIOLATIONS OF FEDERAL CRIMINAL AND CIVIL (AND CIVIL RIGHTS) LAW AND N.Y. STATE
CRIMINAL AND CIVIL LAW (SEE ATTACHED FOR FULLER EXPLANATION)

<u>Bonano, et al., v. Hickey, et al.,</u>

1. CAPTION OF ACTION

A. Plaintiffs

1. Michael Bonano

2. Lydia Acevedo

3. Edgard Acevedo

4. Manuel Bonano

5. Maria Rivera

6. Bruce Rivera

7. Willie Negron

8. Barbara Acevedo

9. Gilbert Acevedo

10. Frank Martinez

11. John Narvaez

-VS-

B. (See attached List of Defendants)

## LIST OF DEFENDANTS

1. Ryan W. Hickey,  Ass't Att'y General, NYS Dept. of Law, The Capitol, Justice Bldg., 3rd Floor, Albany, N.Y. 12224

2. Shannan Krasnokutski, AAG, NYS Dept of Law, The Capitol, Justice Bldg., 3rd Fl., Albany, NY 12224

3. Mark Sweeney, AAG, NYS Dept of Law, 144 Exchange Boulevard, Rochester, NY 14614

4. Ted O'Brien, AAG, NYS Dept of Law, 144 Exchange Boulevard, Rochester, NY 14614

5. Anthony J. Annucci, DOCCS Commissioner, 1220 Washington Ave., Bldg. #2, Albany, NY 12226

6. Stephen J. Maher, O.S.I. Chief, DOCCS, 1220 Washington Ave., Bldg. #2, Albany, N.Y. 12226

7. Robert Shapiro, O.S.I., Threats Bureau Chief, DOCCS, 1220 Washington Ave, Albany NY 12226

8. Mr. Fox, O.S.I. Sr. Parole Officer, DOCCS, 1220 Washington Ave, Albany, N.Y. 12226

9. Douglas E. Holland, O.S.I. Sr. Inv., DOCCS, 1220 Washington Ave., Albany, N.Y. 12226

10. Karen Bellamy, Grievance Director, DOCCS, 1220 Washington Ave., Albany, N.Y. 12226

11. Jennifer Mazzotti, Grievance Dir., DOCCS, 1220 Washington Ave., Albany, N.Y. 12226

12. Dominic Venettozzi, SHU Director, DOCCS, 1220 Washington Ave., Albany, NY 12226

13. John Walters, Syracuse P.O., DOCCS Parole Office, 333 E. Washington St, Syracuse, NY 13202

14. Jacquelyn M. Hughes, Dep. Supt. of Programs, Elmira CF, 1879 Davis St., Elmira, NY 14901

15. Paul W. Chappius, Supt., Elmira CF, 1879 Davis St., Elmira, NY 14901

16. Paul Piccolo, Dep. Supt. of Security, Elmira CF, 1879 Davis St., Elmira, NY 14901

17. Martin J. Titus, Senior Offender Rehab. Coord., Elmira CF, 1879 Davis St., Elmira, NY 14901

18. Robert S. Collins, O.R.C., Elmira CF, 1879 Davis St., Elmira, NY 14901

19. Robert Siglin, Comm. Hrng. Officer, Elmira CF, 1879 Davis St., Elmira, NY 14901

20. Trevor Schadenwald, Lieutenant, Elmira CF, 1879 Davis St., Elmira, NY 14901

21. Robert Bennett, Corr. Off., Elmira CF, 1879 Davis St., Elmira, NY 14901

22. Jim C. Haner, C.O., Elmira CF, 1879 Davis St., Elmira , NY 14901

23. Scott Perry, C.O., Elmira CF, 1879 Davis St., Elmira, NY 14901

24. Misty L. O'Dell, Grievance Supv., Elmira CF, 1879 Davis St., Elmira, NY 14901

<u>LIST OF DEFENDANTS</u> (Con't)                                          Page 2

25. Charles J. Fiscus, C.O., Elmira CF, 1879 Davis St., Elmira, NY 14901

26. Ms. Seananne Courtwright, Sr. O.R.C., Five Points CF, 6600 State Route 96, Romulus, NY 14541

27. Sandra Hill, O.R.C., Five Points CF, 6600 State Route 96, Romulus, NY 14541

28. Mandi J. Schultz, Grievance Dir., Five Points CF, 6600 State Route 96, Romulus, NY 14541

29. James P. Thompson, Supt., Collins CF, Middle Road, Collins, NY 14034
30. Karen Kelly, Dep. Supt. of Programs, Collins CF, Middle Road, Collins, NY 14034
31. George F. Poff, Dep. Supt. of Security, Collins CF, Middle Road, Collins, NY 14034
32. Donald Jones, C.O., Collins CF, Middle Road, Collins, NY 14034
33. Timothy C. Gallagher, F.O.I.L. Officer, Collins CF, Middle Road, Collins, NY 14034
34. James Costello, Sergeant, Collins CF, Middle Road, Collins, NY 14034
35. Mr. Martin, Comm. Hrng. Off., Collins CF, Middle Road, Collins, NY 14034
36. Charles Pickering, Captain, Collins CF, Middle Road, Collins, NY 14034
37. Shannon Miller, Teacher, Collins CF, Middle Road, Collins, NY 14034

38. William Smith, Jr., Parole Comm., NYS Parole Board, 1220 Washington Ave., Bldg. #2,
                                                              Albany, NY 12226
39. Thomas Berliner, Parole Comm., NYS Parole Board, 1220 Washington Ave., Bldg. #2,
                                                              Albany, NY 12226
40. Thomas J. MacAvoy, Judge, NDNY James Hanley Bldg., 100 S. Clinton St, Syracuse, NY 13261

41. Andrew T. Baxter, Mag. J., NDNY James Hanley Bldg., 100 S. Clinton St., Syracuse, NY 13261

42. Barbara A. Roesch, Court Att'y, Seneca County Sup. Ct, 48 W. Williams St, Waterloo, NY 13165   *

43. Samantha Pike, Clerk, Chemung County Sup. Ct., 203 Lake St., Elmira, NY 14901

44. Kim Taylor, Court Att'y, NYS App. Div., 4th Dept., 50 East Ave., Suite 200, Rochester, NY 14604

45. Lawrence X. Dalton, Ct. Atty, App. Div., 4th Dept., 50 East Ave., Suite 200, Rochester, NY 14604

46. Mark Bennett, Clerk, App. Div., 4th Dept., 50 East Ave., Suite 200, Rochester, NY 14604

47. Frank P. Geraci, Chief Judge, WDNY, 111 Keating Bldg., 100 State St., Rochester, NY 14614

48. Mr. McCarthy, Supt., Auburn CF, 135 State St., Auburn, NY 13024
49. Ms. Shanks, Dep. Supt. of Programs, Auburn CF, 135 State St., Auburn, NY 13024
50. Mr. Bauersfeld, Comm. Hrng. Off., Auburn CF, 135 State St., Auburn, NY 13024
51. Mr. Chapin, Transport C.O., Auburn CF, 135 State St., Auburn, NY 13024

2. STATEMENT OF JURISDICTION

This is a civil action to address profound violations of my Constitutional rights via repeated wire frauds perpetrated via a series of collaborations by N.Y. State actors in a long-term conspiracy spearheaded and masterminded by Assist. Attorney General Ryan W. Hickey and several subsequent sets of actors, starting with O.S.I. investigators, DOCCS Comm. Annucci, and Elmira C.F. administrators from Feb. 17 through Feb. 22, 2017, and beyond – thereafter involving Parole Board Commissioners, federal judges and other assistant attorneys general, Five Points C.F. and Collins C.F. prison officials, and finally a series of N.Y. State court officials. **I am therefore invoking 18 USC Sections 1961, et seq., and section 1965(1) for jurisdiction, as well as U.S. Constitution, Art. III, 18 USC sections 1331, 1343(3) and (4), and 2201, and finally 42 USC sections 1981-1986 and multiple pendent N.Y. State laws.**

3. Parties to This Action (See List of Plaintiffs and Defendants, supra)

4. Prior Actions – I have prosecuted at least 12 prior civil rights actions and merely have one (1) stricken for purported 'failure to state a claim', *falsely*, by EDNY J. Weinstein (the same complaint he dismissed was thereafter accepted by NDNY and litigated through 3 years). I also have a presently pending action in this Court, Bonano v. Sheahan, et al., 18-CV-6405. I also raised a habeas corpus, Bonano v. Thompson, and a 1983 action, Bonano v. Costello, et al., 18-CV-6492, both wrongly dismissed by Judge Geraci.

5. Statement of Claims – (1) AAG Hickey, offended by my Jan. 9, '17 letter to him as the pro se litigant in Bonano v. Shapiro, et al. masterminded a scheme over the course of Feb. 17 to Feb. 21, 2017, in concert with O.S.I. investigative officials, DOCCS Comm. Annucci and Elmira C.F. prison officials to falsely and maliciously thwart my Feb. 21, '17 prison release, consequently impeding my

ability to prosecute the 'suit by preventing me from being able to freely consult counsel, and preventing me from pursuing lucrative enterprise such as employment in the legal field, a second major lawsuit (without counsel), and my prospective book series – as well as blogs.

(2) AAG Hickey, apparently continuing to contact other officials subsequently assigned to or otherwise involved with my legal processes arising from the Feb. 21, 2017 suspension of my prison release, was able to persuade and enlist AAA Mark Sweeney to delete the (Feb. 22) misbehavior CHO's 'Day 1' (Feb. 24) admission, **"I can't see how your** [Jan. 9, '17 letter to Hickey] **can be a threat or extortion",** in order to artificially undermine my Chemung County Supreme Court habeas petition and any subsequent administrative and other court challenges I could make to the fraud of a guilty disposition, so as to continue my false imprisonment (commenced Feb. 21, '17) through the middle of 2017.

(3) Elmira C.F.'s highest officials – esp. DSP Jacquelyn Hughes – and Parole Commissioners (esp. William Smith Jr.,) coordinated efforts to further extend my false imprisonment and increase the prospect of eventual rescission by agreeing to postpone my mid-May, '17 Parole rescission hearing (though I had no disposition pending; Feb. 22 MBR was decided Apr. 14, '17) and, as of May 23, '17, had me relocated to Elmira's "I-Block" to be subjected to extreme harassment, 2 assaults and four (4) false MBRs to further cripple my release prospects.

(4) Five Points' S.O.R.C. Ms. Courtwright conspired with Parole Commissioners Smith and Berliner via back-channel e-mail communication during the months preceding my Nov. 28, '17 rescission hearing, in order to apprise them that I was not able to obtain counsel, so that they could take advantage of me and violate every right I was owed under Victory v. Pataki, 814 F.3d 47, 61 and 9 NYCRR section 8002.5.

(5) Collins CF staff, Commissioner Annucci and SHU Director Venettozzi conspired to falsely subject

me to eleven (11) false MBRs to increase the prospect of rescission, to postpone my parole hearing,

and to falsely justify denying me my March 19, '19 Conditional Released date, in profound violation

of <u>Wolff v. McDonnell</u>, <u>Peoples v. Fischer/Annucci</u>, and DOCCS Directive 4932/Title 5 NYCRR Chptr

5. *FURTHER JURISDICTION*

All of these acts of misconduct, fraud and wire fraud took place in the geographical region covered

by the WDNY court in Rochester as I was imprisoned in Southport CF, Elmira CF, Five Points CF

and Collins CF.

6. Requested Relief: 33 million dollars in treble damages for loss of financial opportunities and the

profound violation of my constitutional rights

On this Feb. 15, 2020, I, Michael Bonano, declare foregoing true, under penalty of perjury,

Truthfully,

### 3. PARTIES TO THIS ACTION

**PLAINTIFF'S INFORMATION** **NOTE:** *To list additional plaintiffs, use this format on another sheet of paper.*

Name of First Plaintiff: _(SEE ATTACHED PAGES CONTAINING ALL INFORMATION)_

Present Address: _____

_____

Name of Second Plaintiff: _____

Present Address: _____

_____

**DEFENDANT'S INFORMATION** **NOTE:** *To list additional defendants, use this format on another sheet of paper.*

Name of First Defendant: _(SEE ATTACHED PAGES FOR ALL INFORMATION ON DEFENDANTS)_

Official Position of Defendant (if relevant): _____

Address of Defendant: _____

_____

Name of Second Defendant: _____

Official Position of Defendant (if relevant): _____

Address of Defendant: _____

_____

Name of Third Defendant: _____

Official Position of Defendant (if relevant): _____

Address of Defendant: _____

_____

### 4. PREVIOUS LAWSUITS IN STATE AND FEDERAL COURT

**A.**    Have you begun any other lawsuits in **state or federal court** dealing with **the same facts involved in this action**?

Yes_____   No _✓_   _NOT THESE SAME SETS OF FACTS, BUT MERELY PARTIAL OVERLAP OF SOME_

<u>If Yes, complete the next section.</u> NOTE: *If you have brought more than one lawsuit dealing with the same facts as this* ✓ *action, use this format to describe the other action(s) on another sheet of paper.* _(BUT SEE ATTACHED PAGES FOR FULLER EXPLANATION)_

1.    Name(s) of the parties to this other lawsuit:

Plaintiff(s): _____

_____

2

Defendant(s):_____

_____

2.    Court (if federal court, name the district; if state court, name the county):_____

_____

3.    Docket or Index Number:_____

4.    Name of Judge to whom case was assigned:_____

5.    The approximate date the action was filed:_____

6.    What was the disposition of the case?

        Is it still pending?  Yes_____  No_____

           If not, give the approximate date it was resolved._____

        Disposition (check those statements which apply):

     _____  Dismissed (check the statement which indicates why it was dismissed):

          _____  By court *sua sponte* as frivolous, malicious or for failing to state a claim
              upon which relief can be granted;
          _____  By court for failure to prosecute, pay filing fee or otherwise respond to a
              court order;
          _____  By court due to your voluntary withdrawal of claim;

     _____  Judgment upon motion or after trial entered for

          _____  plaintiff
          _____  defendant.

---

## 5.  STATEMENT OF CLAIM

**Please note** that it is not enough to just list the ground(s) for your action.  You **must** include a statement of the facts which you believe support each of your claims.  In other words, just tell the story of what happened and do not use legal jargon.

**Fed.R.Civ.P. 8(a)** states that a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  "The function of pleadings under the Federal Rules is to give fair notice of the claim asserted.  Fair notice is that which will enable the adverse party to answer and prepare for trial, allow the application of res judicata, and identify the nature of the case so it may be assigned the proper form of trial."  Simmons v. Abruzzo, 49 F.3d 83, 86 (2d Cir. 1995).

**Fed.R.Civ.P. 10(b)** states that "[a]ll averments of claim ... shall be made in numbered paragraphs, the contents of each of which shall be limited as far a practicable to a single set of circumstances."

---

**A.  FIRST CLAIM:** On (*date of the incident*) *(SEE ATTACHED PAGES)* _____,

defendant (*give the **name and (if relevant) the position held** of **each defendant** involved in this incident*) _____

_____

_____

did the following to me (*briefly state what each defendant named above did*): _____

_____

_____

_____

_____

_____

_____

The federal basis for this claim is: _____

_____

State briefly **exactly** what you want the Court to do for you. *Make no legal arguments and cite no cases or statutes*:

_____

_____

_____

**B. SECOND CLAIM:** On (*date of the incident*) *(SEE ATTACHED PAGES)* _____,

defendant (*give the name and (if relevant) position held of each defendant involved in this incident*) _____

_____

_____

did the following to me (*briefly state what each defendant named above did*): _____

_____

_____

_____

_____

_____

_____

The federal basis for this claim is: _____

_____

State briefly **exactly** what you want the Court to do for you. *Make no legal arguments and cite no cases or statutes*:

_____

_____

_____

**If you have additional claims, use the above format to set them out on additional sheets of paper.**

4

### 6. SUMMARY OF RELIEF SOUGHT

*Summarize the relief requested by you in each statement of claim above.*

33 MILLION DOLLARS IN TREBLE DAMAGES FOR LOSS OF FINANCIAL OPPORTUNITIES DUE TO CONSPIRATORIAL AND UNCONSTITUTIONAL ACTS BY DEFENDANTS, INCLUDING NUMEROUS WIRE FRAUDS, TO KEEP ME FALSELY IMPRISONED AN ADDITIONAL 28 MONTHS.

Do you want a **jury trial**? Yes ✓ No____

**I declare under penalty of perjury that the foregoing is true and correct.**

ORIGINALLY ↗ Executed on _Feb. 15, 2020_ (AND SUBMITTED FEB. 19, 2020, RETURNED WRONGFULLY
(date)          ON FEB. 25 BY COURT OFFICIALS AND RECEIVED FEB. 27 )

**NOTE:** *Each plaintiff must sign this complaint and must also sign all subsequent papers filed with the Court.* SEE COURT LETTER

_____
Signature(s) of Plaintiff(s)

5

Revised 05/01 WDNY
**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

*(SEE TYPEWRITTEN ATTACHED IFP MOTION)*

_____

_____
(Name of Plaintiff or Petitioner)

v.

_____
(Name of Defendant(s) or Respondent(s))

_____

**MOTION TO PROCEED *IN FORMA PAUPERIS***
**AND SUPPORTING AFFIRMATION**
_____-CV-_____

I, _____, *(print or type your name)* am the plaintiff/petitioner in the above-entitled case and hereby request the Court's permission to proceed *in forma pauperis*.

In support of my motion to proceed without being required to prepay fees, costs, or give security therefor, I state that because of my poverty I am unable to pay the costs of this action or to give security therefor and that I believe I am entitled to redress.

**I further declare that the responses which I have made in this affirmation below are true.**

1.    Are you presently employed? Yes _____ No _____
        My Employer's Name and Address is: _____
        _____
        _____
        My **Gross** Monthly Wages are: $_____
      If you are not presently employed, state
        Your Last Date of Employment: _____
        Your Gross Monthly Wages at that time: _____
      Is your spouse presently employed? Yes _____ No _____
        My Spouse's Employer's Name and Address is: _____
        _____
        _____
        My **Spouse's Gross** Monthly Wages are $_____

2.    Have you received **any money** from any of the following sources within the past twelve months?
        **a.** Business, profession or self-employment? Yes _____ No _____
            If yes, state **source** and **amount received per month** $_____
        **b.** Rent payments, interest or dividends? Yes _____ No _____
            If yes, state **source** and **amount received** per month $_____
        **c.** Pensions, annuities, disability, or life insurance payments? Yes _____ No _____
            If yes, state **source** and **amount received** per month $_____
        **d.** Gifts or inheritances? Yes _____ No _____
            If yes, state **source** and **amount received** per month $_____
        **e.** Child Support? Yes _____ No _____
            If yes, state **amount received** each month $_____
        **f.** Government Benefits (Social Security, SSI, Welfare, AFDC, Veterans, etc.)? Yes _____ No _____
            If yes, state **source** and **amount received** per month $_____
        **g.** Friends, Relatives or any other source? Yes _____ No _____
            If yes, state **source** and **amount received** per month $_____
        If you have **not** received any money from any of the above sources, please explain how you are currently paying your expenses:
        _____
        _____
        _____

3.    What is your total gross monthly income today: $_____

4.    How much **cash** do you have on hand? $_____

## TABLE OF CONTENTS

Bonano v. Hickey, at al., R.I.C.O., 42 USC 1981-1985, & N.Y. State Law

Pages

I. AAG Hickey & O.S.I. (and Elmira C.F.) Scheme From Feb. 17 Through Feb. 21, 2017, to Fraudulently Present My Jan. 9, '17 Letter to Him as a 'Threat' to Thwart My Feb. 21 Release and Impede My Prosecution of Lawsuit Against His Clients – and Destroy My Other Monetary Opportunities ...................................................... 1 - 6

II. Despite the MBR Hearing Officer's 'Day 1' Admission **"I can't see how your letter can can be a threat or extortion."**, He Would Eventually Find Me Guilty Even After FACTS AND Caselaw Quotes in My Favor ........................................................ 6 – 9

III. The Determinant of the Feb. 21, '17 Release Suspension Decision, Elmira C.F.'s Deputy Supt. of Programs, Jacquelyn M. Hughes, After Writing on March 7, '17 to Urge "Patience" With the MBR Hearing Process *"After"* Which She Would Decide to Reinstate or Rescind Release, Would Reverse Herself and Refer Me for Rescission on March 28, <u>Weeks Prior to MBR Disposition</u> ................................................................. 10-11

IV. After Observing My Adjustment to the Shocking and Malicious Feb. 21, 2017 Release Suspension, and Obviously Aware of the Fraudulent Nature of the Feb. **22** MBR, Elmira C.F. Execs Had Me Relocated to Their "I-Block" on May 23, Whereupon I Was Immediately and Repeatedly Subjected to Harassment, Threats, 2 Assaults By Staff, and Five (5) Phony MBRs Within the Next 60 Days to Increase the Prospect of Eventual Rescission – Nearly All Connected to and Directed By D.S.P. Hughes ...................................... 12-17

V. The Economic Impact on My Family and I of My False Incarceration Beyond Feb. 21, '17 Became Even More Tangible in June, 2017, Yet My Missives to Those Most Responsible Ignored and Continued It – Including and Especially Commissioner Annucci – and Those That Allowed It, Especially Judge MacAvoy ............................................. 18-21

VI. Judges, Clerks, Court Attorneys and Four (4) Assistant Attorneys General Collaborated in Wire Fraud, Repeatedly, In the Course of Four (4) Court Actions to Continue My False Imprisonment, Further Harming My Economic Prospects, Violating U.S.'s R.I.C.O. Laws .. 21-34

A. 'Judges' MacAvoy and Baxter's Subversions of Due Process, In Collaboration With AAGs, In <u>Bonano v. Shapiro, et al.</u> (NDNY), Including Denying Me Prison Release and Counsel .. 21-27

B. In 3 Different, Consecutive State Courts, In Two (2) Contexts (Rescission and Habeas Proceedings), I Was Repeatedly *Cheated* Out of Reliefs That Would Likely Have Resulted Attaining Freedom Sooner, By a Dozen Court Officials, Including a March '18 Habeas That Would Have **Absolutely** Resulted in Immediate Release *Minus* Organized Misconduct ... 27-34

VII. Following My Transfer from Elmira C.F. to Five Points C.F., Senior Counselor Ms. Seananne Courtwright, The Eventual Rescission Case Presenter, Repeatedly Contacted the Parole Commissioners in Months Leading Up to the Nov. 28 Rescission Hearing in Back Channel Communications – Resulting In a Foul Farce to Rescind .................................. 34-38

VIII I Was Suddenly Transferred Out of Five Points CF Though I Was Days Away From Parole Appearance There – and Was Immediately Subjected to 12 False MBRs w/in Following 120 Days and a False Conditional Release ("C.R.") Date Rescission ....................... 38-55

<u>TABLE OF CONTENTS</u> (Con't, Page 2)                    Pages

A. Immediately After <u>Another</u> Oddly-Timed Transfer By Annucci & Thompson, I'm <u>Again</u>
   Assaulted By C.O.s ...............................................................   38-40

B. Upon My Return to Collins C.F., I Was Set Upon By Execs and Staff Via Maliciously False
   MBRs (Including *Another* Assault *by* C.O.s) .........................................   40-45

C. A Sham Nov. 14 T.A.C. 'Hearing', Letters of Objection From Me the *That* Night, and Then
   Retaliation By Execs and Staff the Next Day, Nov. 15 ...................................   45-50

D. Malice of Collins CF Administration, *Both* Past and Present, Confirmed and Continued By
   MHU Chief *Before* She Remedies .....................................................   50-52

E. After My Transfer to Great Meadow C.F. From Collins, My Colorable Challenges to the C.R.
   Date Withdrawal and Phony MBRs Were Obtusely Denied By Prison Officials *and* WDNY
   Chief Judge Geraci, But <u>Not</u> By the April '19 Parole Board .............................   52-55

### STATEMENT OF FACTS

Pursuant to 28 USC 1746, I, Michael Bonano, declare following true, and is all reflected, in transcripts, prison officials' reports and memorandums, as well as my own grievances and missives, all of which I can and will produce, under penalty of perjury:

I. AAG Hickey Schemes With O.S.I. and Elmira C.F. From Feb. 17 to Feb. 21, 2017 to Fraudulently Present My Jan. 9, '17 Letter as a "Threat" to Falsely Prevent My Feb. 21 Prison Release

1. On January 9, 2017, in response to Assistant Attorney General Ryan W. Hickey's and a judge's insinuations that I may not have a legitimate civil rights claim (Bonano v. Shapiro, et al., NDNY), I wrote a seething letter to Mr. Hickey as the pro se litigant.

2. The suit was to address my having been covertly castrated by two (2) S.U.N.Y./D.O.C.C.S., Oleg Shapiro and Timothy Byler, whom urged and performed what was actually prostate removal surgery while refraining from warning me of what the Office of Professional Medical Conduct would later characterize as "*known physical consequences*": sterility and profound erectile dysfunction.

3. The letter and body of the 2-page sworn letter clearly referenced my true and life-altering reduction to a eunuch at the hands of his clients, the alternating despair and rage against them that I had to overcome, and the resulting dim prospect of a settlement unless "you wow me with an offer", and "*I want their careers*".

4. While I further emphasized my anguish by frankly declaring that "up until a few months ago I was fantasizing about torturing and killing your clients" – which I also articulated to Southport CF M.H.U. counselor Mr. Khueffer and a psychiatrist in 2016 – I articulated how I overcame that rage.

5. I had also disparaged prosecutors as a whole and specifically some of his colleagues from his own office as ruthless, an experienced fact that he would proceed to further confirm.

6. During the following weeks I would also write letters to EDNY Chief Judge Irrizarry, Hillary Clinton, the Parole Chairwoman, and family and friends in anticipation of my Feb. 21, 2017 release.

7. On Feb. 16 or 17, 2017, I signed  release to Parole supervision papers with a keeplock counselor (Ms. Kennedy) – who, after providing me with the green copy, returned over an hour later to retrieve it from me.

8. As I would later learn via reports and testimony from three (3) Office of Special Investigations (hereinafter "O.S.I.") employees, late Friday afternoon, Feb. 17, 2017, approximately 3:30 p.m., A.A.G. Ryan W. Hickey, after having secretly seethed for 6 weeks with my Jan. 9 letter, forwarded a copy of it to that D.O.C.C.S. office for 'investigations', less than one business day before my release.

9. O.S.I. employee (although he would alternately i.d. himself in a report as a "Syracuse area parole officer") John Walters in turn sent a copy to Elmira C.F., the prison I was sent to on Feb. 9, 2017 (as a result of my phony 'assault on staff' disposition being reversed and dismissed) from Southport).

10. On Saturday, Feb. 18, 2017, Mr. Walters contacted Elmira to ascertain whether anyone there saw fit to write me a misbehavior report for my Jan. 9 letter to AAG Hickey; Elmira C.F. Lieutenant Michael Randall, to whom the letter was given to review, informed Walters he was declining to.

11. On Sunday, Feb. 19, 2017, Mr. Walters summoned me to the Elmira C.F. visiting room for a 'legal visit' under the pretext of an investigative interview.

12. Though Mr. Walters had a copy of my crystal clear Jan. 9, 2017 letter to AAG Hickey in his hand, and though I reiterated its sentiments including "That [rage] is in the past.", that I would get my revenge in the court, and that I would utilize whatever damages I would garner to take care of my family (inter alia, all of which he would later admit when I cross-examined him in hearings), he would proceed to lie in his Feb. 19 OSI report and claim I was still/presently seeking to harm the surgeons – in addition to misrepresenting the substance and tense of my Jan. 9 letter

13. Disturbed by the 11th hour investigative interview and having had enough experiences with law enforcement to always be suspicious of them, I wrote that night (Feb. 19) to both Commissioner Annucci and AAG Hickey regarding Walters' visit and frankly informed and warned them of what appeared to me to be a transparent last-second ruse to possibly thwart my release.

14. On Feb. 21, 2017, I was processed as one of 2 prisoners to be released; I was in the Elmira C.F. draft room waiting to have my photo taken and then to be escorted to the front gate – where my stepfather and brother were awaiting me in a car to drive me home.

15. After a few minutes the desk officer received a phone call; after he hung up he announced: "Bonano? Your release has been canceled" and I was escorted back to the same cell I had vacated.

16. None of this was explained to my family, who proceeded to have me summoned to the Elmira visiting room 1 hour later to attempt to find out "Why aren't they letting you out?"; I explained my Jan. 9 letter to AAG Hickey and the Feb. 19/Sunday 'legal visit' from O.S.I.'s Walters and my stepfather instantly and presciently stated: *The timing sure is funny.*"

17. On the way back from said Feb. 21 visit, Elmira SPO and senior counselor Martin J. Titus served me a barebones 'notice' of rescission; in the next few days I would learn that he and Elmira C.F. Deputy Supt. Of Programs (hereinafter "D.S.P.") Jacquelyn M. Hughes jointly made the decision at the facility level to suspend my release (but also surely consulted Annucci, Maher and Hickey).

18. The next day, Feb. 22, 2017, I was served a misbehavior report, dated "2/22/17", that charged me with "Threats" and "Extortion", 'based' on my Jan. 9, 2017 letter to AAG Hickey, that set forth facts that, combined with the charges, identically tracked 18 U.S.C. section 876, "threatening communications through U.S. mail".

19. What made the Feb. 22 MBR even more dubious is that the Feb. 19 report by Walters (Page 1)

explicitly stated "**The statements were deemed threatening in nature by Assistant Attorney General Ryan W. Hickey.**", but prosecutor Hickey did not (at least in writing) inform any of his supervisors, investigate me himself for a prospective prosecution, nor even notify the 2 judges that were assigned to the civil rights case that my Jan. 9 letter addressed for dismissal or sanction.

20. Similarly, although O.S.I. and the entire upper administration of Elmira C.F. suspended my release and began and perpetuated misbehavior hearings as *if* my Jan. 9 letter had been a legitimate and present threat equal to a violation of 18 USC 876, "threatening mail communications', they all contravened DOCCS Directives #4422 ("Inmate Correspondence Program", p.1, "II. Policy B.") and #6910 ("Criminal Prosecution of Inmates", p.2, "B. Incident Evaluation") in declining ministerial duty to refer me to court for prosecution (either federal or state).

21. Conversely, I wrote to NDNY Judge Thomas MacAvoy and detailed all of the above in asking him to address the matter generally and AAG Hickey's palpably vindictive puppeteering of O.S.I. officials (*if* not also Elmira C.F. employees) to falsely thwart my Feb. 21 prison release.

22. I had several extremely viable economic opportunities prior to said late February 2017 events, including the <u>Bonano v. Shapiro, et al.</u> lawsuit; N.Y. State civil rights practitioner Cliff Gordon, in a Sept. 16, 2016 reply to my request for his representation, stated "It sounds as if you prevail *it might be for a big number <u>given the terrible nature of your injury</u>*" – and only declined because "**I lack the medical knowledge and aptitude that are <u>absolutely necessary to representing a client adequately in that area of law</u>**.".

23. I also had another civil rights 'suit, the EDNY matter of <u>Bonano v. Staniszewski, et al.</u> 12-CV-5478 to address Brooklyn and central office Parole officials having obscured my early termination of parole application (Exec. Law 259-j), then having cheated me thereafter of the 2-year mandatory termination due to my 2 years of "unrevoked parole", and finally, having singlehandedly prevented

my entry into Judicial Diversion at the 32 month mark (of unrevoked parole) that would have satisfied the criminal case (for which I have served over 10 years thereof, and 7 as of Feb. 2017) without any prison nor further jail time beyond June 2010.

24. As I would state in numerous filings and in a deposition in the <u>Shapiro</u> 'suit, had I been released on Feb. 21, 2017, it would have been into "a city [N.Y.] teeming with civil rights attorneys", a fact also relevant to the <u>Staniszewski</u> lawsuit as well (litigated over 5 years, pro se).

25. I also had the prospect of a series of books that I intended to write (and still will) – far easier as a civilian with immediate access to word processing and attorneys litigating my suits – titled "Covenants, Conspiracies . . . and Convictions".

26. It will include not only the case that first prompted me to study and practice law 20 years ago (my own for which I was falsely charged and eventually convicted of phantom stabbings) but also those of the many other prisoners (80 – 120) I've done legal work for, most of which would cause a public outrage among the otherwise uninformed masses.

27. In fact, on Jan. 15, 2017, I wrote a letter to "E.R. Hamilton Books" referencing said series to gauge their interest in assisting my compilation of it for their publication, and on March 13, 2017, I would write to the U.S. Patents and Trademarks Office to trademark said title (answered Apr. 25).

28. Said series will include the disgraceful and despicable prosecution of Lawrence Blair, Jr., who was tried, convicted and sentenced to 16 years to life for an unarmed residential burglary netting him merely several items of canned food and a Christmas tree stand for the then middle-aged, mentally ill and borderline-retarded 5', 2", 110 pound Caucasian man – **merely one of <u>many.</u>**

29. Relatedly, my plan also included blogging, through which I could maximize public interest in, and outrage to, said book series and otherwise illustrate my writing and analytical skills broadly.

30. Finally, there would have also been my likely acquisition of a lucrative position and career as a legal researcher, analyst and filings compilator: at the time I had 17 years experience litigating; the N.Y. State Attorney General's office stated in Page 21 of their June 12, 2015 reply brief to rebut my pro se appeal to the 2nd Circuit of my civil rights case's wrongful dismissal: **"Bonano is a repeat player; a sophisticated litigant"** – in arguing I should be denied (mandatory) pro se liberality.

II. Despite the MBR Hearing Officer's 'Day 1' Admission **"I can't see how your letter can be a threat or extortion".**, He Would Eventually Find Me Guilty Even After I Discredited All 3 OSI Employees and Adduced Numerous Documents, Arguments and Caselaw Quotes in My Favor

31. On Feb. 24, 2017, I was summoned for the first day of hearings on the misbehavior report by Commissioner's Hearing Officer (hereinafter "C.H.O.") Robert Siglin; as reflected in pages 17-20 of that day's hearing transcript (subsequently produced by A.A.G. Mark Sweeney for habeas action), I read the entirety of my Jan. 9, 2017 2 page letter addressed to AAG Hickey, to CHO Siglin – to which he replied "I can't see how your letter can be a threat or extortion" (although said reply was omitted from AAG Sweeney's transcript, my subsequent transcribed references and Siglin's replies confirm it at numerous subsequent junctures).

32. In fact, even aside from the odd last second machinations by AAG Hickey (admitted as "curious" and "suspicious" by CHO Siglin, on the record), CHO Siglin states on page 31 that day that he was "adjourning" the hearing due to the "obviously past tense wording of the letter" to do some "research" in contemplation of dismissal; said adjournment occupied 12 days.

33. However, even though he claimed not to have found anything "on point", he somehow went from 'not being able to see how my letter could be a threat' to being 'able', with no basis; I would

specifically comment on and object to this, and, upon further inquiry from me Siglin could not cite

or name a single case as he meandered generically and nonsensically.

34. He then sought to continue by calling the Feb. 19 OSI Investigator, Mr. Walters, pointing to his

Feb. 19 report's lies that I 'told him' I was still desiring to physically harm the surgeons.

35. Early on in his direct testimony he repeated the lies in his report (e.g., ps. 24 & 28 [of 31]), and

in reply to my cross-exam of him he initially claimed the reason he omitted the past tense language

of my Jan. 9 letter from his own Feb. 19 report was "because of what he [I] told me" (p.1, March 9).

36. But after I exposed his complete inability to identify the source of his Feb. 19 report's claim I

had "a history of violence" (including grasping at a "harassment" misbehavior charge and the March

'16 [phony] 'assault on staff' that was reversed and dismissed on Feb. 9, '17; March 9, ps. 3-7), he

incredibly admitted that (March 9, ps. 7-9):

(1) I told him my rage was "**in the past**";

(2) That my "family is in debt" and that I would therefore pursue the surgeons' malice in court to
    enable me to "provide for them"; and

(3) That he asked me "What's the first thing you're going to do when you get off the bus [home]?",
    and that I answered "**Get an attorney** [for my suit]."

37. I encapsulated Mr. Walters' cross-exam admissions and their inescapable significance that he

essentially lied in his Feb. 19 report and in his initial hearing testimony claims that I 'still' wished to

harm the surgeons, and that "I don't know how you can continue with this [hearing]" (March 9,

p.12), but Siglin proceeded to call OSI Senior Investigator/S.P.O. Mr. Fox even after I directly and

explicitly reminded Siglin of his own Feb. 24 admission of "I can't see how your letter can be a

threat" (March 9, ps. 20-21) – which he *acknowledged* (id.).

38. S.P.O. Fox (as did Walters) stated (3/9, ps. 39-46) he received my letter and Hickey's e-mail on

Friday, Feb. 17, explicitly stating, as follows (March 9, p.43, top 2 paras.):

"[ ]The investigation was based on the [Jan. 9] correspondence that was received by Assistant Attorney General Ryan Hickey, so **he** forwarded that to the department and again we got this at [ ] I got an e-mail [ ] about **3:30 on that Friday** [Feb. 17, '17], um, and uh, dispatched John Walters [ ] **just trying to look at the uh, at the uh, <u>string of e-mails</u> so . . . ".

39. But thereafter S.P.O. Fox, in response to my cornering him regarding the Feb. 17 submission

by AAG Hickey of my letter and his directions on Feb. 17, apparently trying to protect the coward's

puppeteering, now tried to deny it was Hickey, and further incredibly claimed (as did Walters and

misbehavior report author Mr. Holland) that they neither spoke to *nor had any other form of*

*communication with Hickey* – despite the clear "initial determination" of "a present and credible

threat" <u>by "AAG Hickey"</u> as clearly written in Walters' Feb. 19 report read and signed by SPO Fox.

40. I repeatedly pressed further (**"There's no other way they could definitively know that Mr.

Hickey found the threat to be credible"**; 3/9/17, p.45), and after 6 pages of advocacy for Mr. Fox

and other obstructions by CHO Siglin, Fox then ridiculously claimed the quoted determination by

Hickey *"must be a typo"*.

41. Finally, then came MBR author, OSI Senior Investigator Douglas E. Holland; after first stating

definitively – consistent with his colleague Mr. Walters' Feb. 19 report – that AAG Hickey sent the e-

mail to their OSI office, when I began to zero in on that in cross-examining him he likewise

equivocated protectively to now obscure Hickey's role as puppetmaster (ps. 1 & 2 "of 33"):

"Let me clarify. Mr. Hickey, I believe, *or it may have been his secretary, or clerical worker*, sent an e-mail to my supervisor, the Chief of OSI, and said do whatever action you deem necessary. That's the extent of the e-mail. The e-mail was then forwarded to my supervisor with [other] e-mails."

42. I concluded my cross of Holland by ridiculing this vacillating, revisionist testimony (p.3 of 33):

"So that's why I'm asking? **With an e-mail you know who the sender was. There's <u>no way you got an e-mail and you don't know who sent it.</u>**"

43. I also summarized and ridiculed Mr. Holland's alternating and mutually exclusive rationales for concluding that my Jan. 9 letter's completely past-tense description of the rage I had felt was presently a threat – first testifying 'we wanted to find out if he still felt that way' then claiming 'it didn't matter whether it was past or present' – that culminated with the contrived conflation "*What was past is still present.*" (ps. 44-45 & p.3 of 33)(along with his *omission* of said past tense phrasing and *substitution of present term language as he 'quoted' my Jan. 9 letter*, ps. 47-51).

44. I finalized my defense via my stepfather's testimony referencing my nearly daily letters to him reflecting nothing but enthusiasm and positive endeavors such as (1) my "lawsuits"; (2) to seek employment with a law office; and (3) to start a blogging website and a series of books – and a stay in a hotel with my brother Monday night, Feb. 20, '17, after lengthy car commute, to enable them to pick me up from Elmira on Feb. 21 to drive me home, ending in the stunning release cancellation.

45. This was in addition to entering as exhibits the numerous release preparation letters (supra) I compiled and submitted, chief among them the Jan. 9, '17 letter I sent to N.Y. City Transit (i.e., the same date I wrote to AAG Hickey) to try to resolve the fines I owed ("If I'm planning to kill 2 surgeons, *I'm not worried about fines I owe.*"), as well as my Jan. 11, '17 letter to a urologist asking about viability of testosterone therapy to resuscitate my libido and/or procreative ability.

46. This was also in combination with my citation and quotation of U.S. v. Turner, 720 F.3d 411 (2nd Cir., 2013) at 426: **"The relevant intent is the intent to communicate a threat**."

47. Yet CHO Siglin incredibly found me guilty, Apr. 14, of threats (even as he paradoxically ruled not guilty of extortion), despite his Feb. 24 admission "I can't see how your letter can be a threat", cited the OSI employees I discredited, and a U.S. Supreme Court case, Elonis v. U.S. for the "fear that a reasonable person" may perceive upon receipt of the letter, *explicitly rejected by the Court.*

III. The Determinant of the Feb. 21, '17 Release Suspension Decision, Elmira C.F.'s Dep. Supt. of Programs, Jacquelyn M. Hughes, After Writing on March 7, '17 to Urge "Patience" With the MBR Hearing Process "After" Which She Would Decide to Reinstate or Rescind Release, Would Reverse Herself and Refer Me for Rescission on March 28, *Weeks Prior to MBR Disposition* – Along With Other Extremely Odd Acts By Minions She Directed

48. From Feb. 24 to Feb. 28, '17, I wrote to Elmira C.F.'s Supt. (Paul Chappius), Dep. Supt. of Security (Paul Piccolo), and Dep. Supt. of Programs (Ms. Jacquelyn M. Hughes), regarding the Feb. 21 release suspension, and urged them to simply compare the despicably deceitful Feb. **22** "Threats and Extortion" misbehavior report (hereinafter "MBR") to my actual Jan. 9, '17 letter to AAG Hickey, and subsequently and immediately reinstate my release forthwith – aside from grievances.

49. On March 7, '17, DSP Hughes, in a letter headed "Your Letters to Executive Team", wrote:

"Your letters to all the Executive Team members have been referred to me for response. You currently have a pending misbehavior report for bribery/extortion and threats. **When this hearing is <u>complete</u> your entire situation will be reviewed.** This includes but is not limited to your release date.

Please be patient as the disciplinary process is completed."
(emphases mine)

50. Contemporaneous with the hearing process, Elmira CF counselor/Facility Parole Officer (hereinafter "FPO") Robert S. Collins, summoned me for an interview regarding my release suspension and possible rescission, to compile a report thereon, on Feb. 27, '17.

51. I gave him all the above information verbally, and he oddly concluded by voicing anger with my letter to AAG Hickey ("Telling a man to [fellate you] is a threat.") *and asking me for the name of the judge assigned to the lawsuit that my letter to AAG Hickey addressed* (J. Thomas J. MacAvoy) – as reflected in my letter of later that day (Feb. 27) to counselor Collins and <u>his own</u> subsequent report.

52. On March 28, '17, I obtained notary for my state habeas corpus for Chemung County court, from the Elmira C.O. posted to the law library.

53. The *next* day, March 29, I was finally given a copy of the Rescission Investigation report (after previously being denied it via FOIL request), *the same day* that DSP Hughes forwarded it to DOCCS's central Parole office, for rescission referral – *prior* to MBR disposition (Apr. 14) and contrary to her above-quoted March 7 letter to me clearly stating such decision would be deferred until then.

54. The Rescission investigation report was inundated with maliciously false errors about my past criminal and institutional histories, seven (7), as follow:

(1) Identically to OSI employee Walters' report and the MBR, Mr. Collins stated I *presently* wished to harm the surgeons, falsely;

(2) Characterized me as "violent" on the sole basis (none other exists) of the phony March 21, '16 'assault on staff' – although it had been reversed and dismissed on Feb. 9, '17 and was the basis for that same day's transfer from Southport CF *to* Elmira C.F.;

(3) Listed "a handgun" as a "weapon" I have used or possessed, even though the *only* charge I ever had for it was a wrongful one and **dismissed** long before I pled guilty to Burglary in the 2nd;

(4) Falsely and viciously referenced my first 3 arrests and convictions, all misdemeanors for prostituting *myself* to adults, as "**sex crimes**" to smear me as *actual* "sex offender" as *if* I had ever been a rapist, pedophile or other victimizer – contrary to DOCCS's own records on me;

(5) Deceitfully described me solely as "Angry, unfocused and off topic", despite my clear writing and speaking skills – and despite *his own* page 3 recording of my "focus on family" and "blogging and writing" plans;

(6) Disgustingly characterized my use of DOCCS mental health services and anti-depressants (to cope with the 2013 surgical covert castration) as "*mental instability*"; and

(7) Claimed "drug offenses", though the only few arrests and charges were all misdemeanors for minimal and personal possession and use – as it is the sole source of my criminal history.

55. My letters to Mr. Collins and DSP Hughes and consequent grievances resulted in refusals to remedy the intentional lies in the Rescission Investigation report.

56. Further, on March 30, the morning after I was summoned to their office and given the Rescission investigation report, Counselors Martin J. Titus and Collins proposed a 9 month 'offer' for a plea of guilty from me; upon my immediate refusal they asked "**What would you accept**?".

57. I also refused that offer – one clearly implying they were amenable to even less than 9 months though I could receive a rescission of 2 years or more, and their awareness of what a fraud the Feb. 22 MBR was – and that afternoon was placed on Keeplock for next 4 days in retaliation therefor (I had been removed from cell confinement on March 18 upon completion of prior disposition of Jan. 13 at Southport, and was not confined for Feb. 22 MBR as it did not involve Elmira staff or inmates).

58. Also, the counselor Mr. Collins had forwarded my March 29 request for appointment by Chemung County of attorney for the Rescission process (which Victory v. Pataki, 814 F.3d 47, 61 clearly says is "a right"), but though I was appointed the Chemung Public Advocate's Office on April 7, 2017 (reflected in Chemung Court document not submitted to me until August after my inquiry and subsequent transfer to Five Points C.F. in Seneca County), neither the court or PAO ever contacted me over the subsequent 4+ months – though PAO supposedly contacted Mr. Collins (claimed by him in an August 2, '17 letter to me), first of many odd omissions by court staff (infra).

59. The only attorney who contacted me during the 6 months I was at Elmira was one whom was misinformed that I was navigating an appeal of a conventional denial of parole (

60. Further and finally, in response to my June 6, '17 list for witnesses for my rescission hearing for cross-examination purposes (including O.S.I.'s Mr. Walters and AAG Hickey), which Victory and Parole's own "Notice of Rescission Hearing" guarantee a right to, counselor Collins replied and oddly (and without standing) "denied" me AAG Hickey to cross-examine though that is a decision to be made by the Parole Commissioners/Rescission hearing officers.

61. Mr. Collins also gave an inherently contradictory and false explanation therein as to why and how DSP Hughes referred me for rescission before disposition of my Feb. 22 MBR after having earlier stated the converse – and rationalized this as 'normal procedure', contrary to caselaw.

IV. After Observing My Adjustment to the Shocking and Malicious Feb. 21 Release Suspension, and Obviously Aware of the Fraudulent Nature of the Feb. 22 MBR, Elmira Administration Had Me Relocated to their "I-Block" on May 23, Whereupon I Was Immediately and Repeatedly Subjected To Harassment, Threats, 2 Assaults By Staff, and Five (5) Phony MBRs Within the Next 60 Days, To Increase the Prospect of Eventual Rescission – Nearly Every One Connected to DSP Hughes

62. On March 18, '17, I was released from Keeplock, my 60 day term for a "Harassment" MBR having elapsed, with no pre-disposition confinement for the Feb. 22 "Threats" MBR (supra).

63. Although angry and dejected over the Feb. 21 release suspension, I maintained my composure and endeavored to address the abuse administratively and in the courts, and even obtained assignment in the Elmira C.F. law library as a clerk, starting in mid-March, with no incidents.

64. That was until May 23, 2017 (though I had been moved 3 times, inexplicably, from one unit to another), when I was transferred to I-Block, a unit comprised of largely keeplock galleries with a small percentage of programming prisoners – and a majority of the most aggressive Elmira C.O.s.

65. Within 5 minutes of my arrival there, simply in response to my having obtained and utilized a mop to clean my new cell 'without authorization', a C.O., Charles J. Fiscus, threatened to "break your fucking jaw" – which I grieved that day and informed I-Block Sergeant Jeffrey Isaacs of.

66. Although I had been working in the Law Library for nearly 2 months, it was only for one module (morning), my first priority was to do clerical assignments, and as I had 2 civil rights actions pending, my direct appeal, and the state habeas corpus, all pro se (aside from the rescission), I had been seeking "special [deadline] access", or in the alternative, assignment to an additional module as a law library clerk or permission from the steadily posted library C.O.s to attend and use the library even for modules I was not assigned for, to allow me to do my own.

67. On May 20 I wrote to DSP Hughes for law library "special access", and again on May 23; she replied in letters of May 23 and May 26 with odd rationales for denying me – the latter of which

68. However, that May 26 day I attended law library and was not subject to an MBR disposition nor even a pending hearing or report.

69. The *next* day, May 27, I was written an MBR by I-Block C.O. Scott Perry, although I merely asked to be allowed to go the law library for the afternoon mod (I went that morning as a clerk).

70. That same May *27* day I was put on cell confinement, and in the MBR I received C.O. Perry lied and claimed I had "demanded" he let me out for law library, and when I was denied I cursed at him, yelled that as a morning clerk I had "the right to go anytime" and said "enjoy the grievance".

71. This was completely betrayed by the letters I wrote to the Program Committee, the law library C.O.s, DSP Hughes, and even the housing unit officers *asking them all to allow* me to attend law library for sessions *in addition* to my assigned morning one.

72. On June 2, I-Block C.O. Jim C. Haner also wrote me a false MBR; he had already twice denied me keeplock showers, and let me out the day before under the pretense of compensating for the previous day's refusal – to afford him the opportunity to 'search' my cell and place my property in complete disarray.

73. Eerily similar to C.O. Perry's false May 27 MBR, he falsely attributed statements to me emphasizing my assignment as a law library clerk, and even contrived that I "yelled" at him "I'm a law library clerk! I'm going to get you when I get out [of Keeplock]!" – and did so loudly that *other prisoners* shouted at me to 'quiet down'.

74. Ironically, in missives to Elmira administration complaining of the harassment by C.O. Fiscus, I had lauded C.O. Haner and the Elmira C.O.s up until then as "very professional".

75. Nevertheless, Lt. Trevor Schadenwald and CHO Siglin would find me guilty despite the above documents undermining the eerily similar, suspiciously timed and palpably spurious MBRs.

76. Please note that at the mid-May Parole Board, the week before I was transferred to I-Block, the Commissioners oddly postponed my rescission hearing although my Feb. 22 MBR was decided on April 14, and I had no other disposition or MBR pending – the sole rationales for the March and April rescission postponements (though no disposition on the Feb. 22 MBR was needed to *commence* rescission process as of March 29; infra).

77. Please also note that on June 10 I broached the phony May 27 MBR by C.O. Perry and his own of June 2 in a discussion with C.O. Haner, and I voiced the connections I made to the suddenly harsh, abusive and disparate treatment of me by Elmira C.O.s to guidance by D.S.P. Ms. Hughes: " [ ] **I believe DSP Hughes put you guys up to all this** [ ]."; C.O. Haner answered: "**I don't want to talk about that**." (quoted in my June 17 facility grievance and a July 13 letter to Supt. Chappius) .

78. During the 2 week confinement in I-Block's 1 Gallery, 21 cell, leading up to the June 16 guilty finding by Lt. Schadenwald for the May 27 MBR by C.O. Scott, I began to be threatened by C.O. Robert S. Bennett as well; it started with an escort by him to bring me to the infirmary during the first week of June during which he threatened to "punch you right in your face" simply because I asked "shouldn't I be able to place my letters in the mail box?" after he ordered me to "put them down" on a windowsill and "you can get them on the way back if they're still there".

79. On June 6, an I-Block porter by the nickname "A.B.", informed me he repeatedly heard the I-Block C.O.s disparaging me, especially C.O. "Bennett" and warned me (quoted in June 8 grievance):

"He [Bennett] is lining you up [ ]. He's also beat-up buddies with Fiscus. [ ] They do dudes dirty; **they'll wait until everyone's out the block, let you out for shower and jump you and beat you up.**"

80. 2 weeks later, that is *exactly* what happened, 2 days after C.O. Bennett assaulted me and I wrote angry letters to 6 upper administration staff demanding that he not assault me again (in the

1.

June 8 grievance I asked that he be prevented from escorting or interacting with me) – and as a ruse insisting I would "spit on and smack him" if he were to do so again (including 1to Bennett himself).

81. On June 20 I placed these letters and 2 stamped letters addressed to 2 sets of relatives to apprise them of all of this in the hands of the I-Block officer collecting mail – all re-routed.

82. On June 21, approximately 10:00 a.m., I was the *only* 3 Gallery prisoner let out for keeplock showers (6 at a time are supposed to be let out, one immediately after another).

83. As I exited the gallery and was passing through the hallway leading to the shower area, I saw about 5 C.O.s assembled, with C.O. Bennett and C.O. Fiscus on each side of the shower entryway, and

a step before I would have passed him, Bennett lowered his shoulder and drove me backwards into the wall behind and to the right of me – and as I slid down it (I was in shower slippers), he began to punch me in the face and head as he taunted "Are you going to spit on me?".

84. He assaulted me at length, in 3 bursts, the 2nd and third of which consisted of punches to my sides; for the 3rd round of it, as one officer placed a cuff on my left wrist and struggled to place my right in the other, C.O. Bennett and another unknown C.O. repeatedly both punched me in my right upper torso (C.O. Fiscus merely watched the 'festivities') – until my 10th right rib broke.

85. The next day I received 2 phony misbehavior reports, both written on June 21 and designed to try to conceal the gang assault; one was written by C.O. Jim Haner falsely charging me with "threats" and citing the same 6 missives I sent out on June 19 (or 20) that were rerouted by I-Block C.O.s and misrepresented as a single "10 page letter" to C.O. Bennett – and claimed 'found under his bed'.

86. The other one was written by C.O. Bennett falsely claiming I spat on him (obviously inspired by my re-routed letters to staff) and swung a sock with a bar of soap in it, at him.

87. Within a week I not only grieved the June 21 staff gang assault and the 2 June 21 false MBRs that were written to obscure it, but I *also* compiled a sworn N.Y. State Civil Service section 75 Complaint about the entire matter, within which I sought to have C.O. Bennett subjected to a psychiatric evaluation *and* a polygraph/lie detector test (and offered to be subjected to one <u>myself</u>) – and sent copies of the latter to Supt. Chappius, Commissioner Annucci and N.Y. State Civil Service Commissioner Ms. Caroline Ahl (starting June 28).

88. On July 3 I was summoned for the start of the hearing for *both* false June 21 MBRs and was flabbergasted when I saw the employee name tag and read it aloud: **"DSP Hughes?!"** – to which she incredibly responded "Be nice.".

89. In addition to the above-related connections to the Feb. 21 release suspension, the March 29 rescission report infested with malicious lies about my criminal and institutional histories, the March 30 9-month rescission 'plea offer' and that afternoon's confinement of me for 4 days thereafter for refusing said plea, and my May 23 transfer to I-Block to be subjected to the false misbehavior reports and reign of terror by the C.O.s there, this was the same DSP Hughes who, in addition to having responded to my late February missives *on behalf of the <u>entire</u> Elmira CF executive team*, did the following:

(1) Incredibly assigned <u>herself</u> to 'investigate', and decide, my March 1 grievance titled "Challenging Suspension of Release Date" clearly, accurately accusing *her* as the primary wrongdoer, denying it on April 5 (withheld from me until 5/25/17) as she lied and implied she made the release suspension *and* rescission decisions simultaneously (cf., her March 7, '17 letter quote);

(2) Persistently provided false rationales for delaying and denying me "special access" to the law library, especially the May 26 one in which she *forecasted* the May 27 false MBR and consequent "confinement status";

(3) Had my program assignment as law library clerk rescinded in early June *before* any MBR Disposition and contrary to Elmira C.F.'s own and DOCCS program assignment regulations; and

(4) The week after, on or about June 10, made my program assignment "ABE 1" (for academically/ intellectually challenged prisoners), "<u>A</u>dult <u>B</u>eginner's <u>E</u>ducation", completely inapplicable.

90. Fittingly, DSP Hughes conducted that day's hearing portion farcically; in addition to denying me indisputably relevant documents for my defense against the two falsified and conflated June 21 MBRs and preventing me from lodging procedural and substantive objections, she incredibly halted my account of what *actually* happened on June 21 immediately after I *started* to relate it: "That's it. *All you have to do is say you didn't do it.*"

91. I grieved that as well, and wrote to Supt. Chappius, by July 5, and again on July 9 and 13 to him and Commissioner Annucci; whether due to the Civil Service section 75 Complaint against CO Bennett or the other referenced missives, I was *not* called to another day of hearings for the phony June 21 MBRs – and was oddly only notified by CHO Siglin of the dismissals of those 2 MBRs during his administration of *another*, earlier MBR (the first false MBR by C.O. Haner, of June 2) in mid July.

92. And, indicative of the extreme zeal of Elmira administration to perpetuate the false MBRs, CHO Siglin (though technically assigned, supervised and employed by DOCCS Commissioner, is simply and actually another long-term Elmira CF employee) took until August 9 (over 2 months) to complete the hearings for the palpably false June 2 MBR, also seeking approx.. **11** extensions.

93. The final false MBR (the only one able to be fabricated against during the 2 months I was in the Elmira S.H.U. (unlike their Keeplock unit of I-Block, it is covered with cameras) arose from a mere July 22 letter to my MHU (Mental Health Unit) therapist, Phylicia Palmer, detailing the above abuse, the lawsuits for which I could not obtain an attorney due to my continued incarceration, and the financial and relational hardships my family had suffered thereby (infra) – and offered her 5% of the damages awards I would eventually receive for each lawsuit upon her referral to and acquisition of an attorney for me (to also receive assistance with rescission).

94. Although I had made a nearly identical offer to CHO Siglin *during* the course of hearings upon the Feb. 22 MBR, I was written a Tier 3 (other than the 2 dismissed June 21 MBRs, even the hearing officers, as well as Supt. Chappius, conceded that the Elmira MBRs should have been merely Tier 2s), I was charged with "Bribery" – contrary to DOCCS's own definition of it and the fact that I did not ask Ms. Palmer to alter her administration of duties or services to me.

95. I was also charged incredibly with "Stalking" and "Harassment" although I simply paid her a single, generic and respectful compliment in Page 1 ('you can catch more bees with honey') and the entirety of the contents of the 4-page letter concerned nothing other than details about my lawsuits and prospective book series – with *no* suggestion of personal contact or obligation.

96. Nevertheless, counselor Charles L. Reinhart, assigned as hearing officer for that MBR, found me guilty despite my above related objections; he also refused me testimony from CHO Siglin about my having extended the same offer to him after initially agreeing to.

97. For each of the above MBRs I was given from 60 to 120 days for *each* one, contrary to the clearly stated Peoples v. Fischer/Annucci SHU class action civil rights action and resulting 2016 settlement that yielded the principle that "only the *most* serious and violent conduct" should result in confinement of more than 30 days – *aside* from the fabricated nature of each of mine.

98. Please note, I challenged each of these misbehavior reports during the eventually held Nov. 28, 2017 Rescission hearing with documents/exhibits establishing all of the above; the Parole Appeals specialist later assigned to me, Charles Greenberg, Esq, in a March 23 '18 letter to me, said:

**"You have provided documents that demonstrate that the Tier III reports are fabrications."**

99. Despite my administrative appeals to DOCCS SHU Director Donald Venettozzi and my having repeatedly demonstrated each of the Elmira MBRs (among *many* others) as false, they were denied.

V. The Economic Impact on My Family and I of My False Incarceration Beyond Feb. 21, '17 Became
   Even More Tangible as of June, 2017, Yet My Missives to Those Most Responsible For Said
   Continued False Imprisonment and This Damaging Development Ignored and Continued It,
   Including and Especially, Commissioner Annucci - and Those That *Allowed* It, Esp. J. MacAvoy

100. On June 28, 2017, my stepfather, Edgard Acevedo, sent me a letter stating that he and my

mother had accrued approximately $60,000 in debt that also resulted in strain and termination of

their 43 year marriage – and residential separation.

101. Had I been released on Feb. 21, 2017 and not subjected to the maliciously false Feb. 21

release suspension and Feb. 22 MBR perpetrated by AAG Hickey and OSI, and perpetuated by the

highest officials of DOCCS central office and Elmira C.F., I would have been released to a N.Y. City

abounding in civil rights attorneys with the Staniszewski and Shapiro actions still pending in the

EDNY and NDNY courts – with the latter action not yet entering the Discovery phase.

102. Please note that within a few weeks of my eventual June 27, 2019 prison release, I obtained

an attorney (D. Andrew Marshall) on a contingency basis for a lesser civil suit in the N.Y. State Court

of Claims who also would have taken my other presently pending 'suit (Bonano v. Sheahan) had it

not been filed in the WDNY court in Rochester; this reflects a virtual certainty that he would have

taken the Staniszewski action in the EDNY court merely a few miles from his lower Manhattan

office – especially as success would have yielded damages for 7 years of unlawful imprisonment

occasioned by Brooklyn and central office Parole officials' bad acts (supra).

103. I have no doubt that I would have also obtained other counsel for the Shapiro NDNY action

and its factually and damages potentiality explosiveness arising from the novel and monstrously

cruel covert castration I was knowingly and deceitfully subjected to by the urologists  - as it had not

yet entered Discovery.

104. It is also a certainty that I could have (and would have) leveraged one or both of those 'suits,

upon acquisition of counsel, to make my mother and stepfather solvent (and avert their break-up).

105. My family and I have always been communal emotionally and financially; this is established by, inter alia, my having sent my stepfather, Edgard Acevedo, and my brother, Marcos Acevedo (the same relatives who came to pick me up at Elmira C.F. on Feb. 21, '17) $500 each immediately after I was sent a $4,000 settlement check resulting from a lesser civil rights 'suit against a N.Y. City jail (recorded in Gouverneur C.F. disbursement forms of 2011, in my possession) – despite a $750 court surcharge having been subtracted from it by DOCCS, and other transcription and filing fees to come.

106. This is further established by the total of well over $2,000 in funds sent to me by my stepfather and brother (supra), my biological father (Manuel Bonano), as well as book purchases and orders sent me by my aunt and uncle (Maria and Bruce Rivera).

107. This does not even yet factor in the numerous letters sent the authorities (including Commissioner Annucci, Parole, and Southport CF and Five Points C.F. superintendents) by the above to address abuses against me and advocate for my release by the above (including past such efforts by another aunt and uncle, Barbara and Gilbert Acevedo), unguided attempts to obtain counsel (including another uncle, Frank Martinez), and visits from 2 other uncles, Willie Negron and John Narvaez – all documented in DOCCS reports and/or logbooks – all but 2 on fixed incomes.

108. But in response to early July '17 letters I sent to Commissioner Annucci – who, despite DSP Hughes' eager ownership of the Feb. 21, '17 release suspension, necessarily agreed to it jointly – and Elmira Supt. Chappius, I received nothing but silence borne of indifference.

109. This is the same Commissioner Annucci who, beyond having been indifferent and obtuse on many, many prior occasions, had actually engineered malicious acts against me through much of this process (indeed, *if* not all of it) jointly with others - starting *at least* with approving increase in my security classification from medium to maximum, *and* earmarking me for transfer to Southport C.F., all on 2/25/16 (said documents I acquired via F.O.I.L.), at the behest of Collins Supt. Thompson.

110. That is the same Southport C.F. at which I was gang-assaulted by staff a week after my arrival, and a day after a "3/16/16" notice that I was being denied any time-cut (for the phony 1/15/16 'weapon' charge – the only one incurred by me in over 22 years of prison time) – in order to be held there until arrangement of transport.

111. The very *next* day, after I cooperated with placement of handcuffs and interlocking waistchain and with a body search by hand and with metal-detecting wand, was lifted up and slammed face-down by C.O. Tillinghast and immediately jumped and assaulted by 5 more officers, all in isolation – then was charged 4 days later (March 21, 2016) with 'assault on staff' to conceal the *sole* assault that was committed against me; the first and only assault charge ever assault charge I ever incurred in 22 years of prison time, at the age of 50 years and 5'5", 145 lbs, pursuant to a prima facie ridiculous set of misbehavior allegations (eventually dismissed by Albany *and court*).

112. This is a stunning series of unusually and suspiciously-timed 'coincidences' made even more so by virtue of Comm. Annucci's written explanations, by his *chosen* designees, as to why my security classification was suddenly elevated to maximum from medium after service of 7 years, *all in medium-security prisons*, upon a sentence of 6 to 12 years for <u>non-violent</u> crimes, **on "2/25/16"**.

113. His *first* responsive claim, by Ass. Commissioner Anne Marie McGrath, July 26, 2016 was:

"**<u>Due to your Tier III ticket</u>** [*the 3/21/16 'assault on staff*] **resulting in 270 days SHU, you were transferred to Southport Correctional Facility.** Your current Maximum A security classification and current placement are [thus] deemed appropriate, at this time."
(emphases mine).

114. "Your Tier III ticket resulting in 270 days SHU" could only be in reference to the 3/21/16 Southport C.F. MBR, as it is *the only one* during this prison term (indeed, ever in 22 total years of prison time) – an *inconceivability* as the basis for my **earlier "2/25/16"** security classification increase and designation for <u>transfer to</u> Southport C.F..

115. This does not even yet factor in *why* I was transferred from Southport C.F. to *another* maximum security prison (Elmira C.F.) on Feb. 9, 2017 even though that "Tier III ticket resulting in 270 days SHU" was *dismissed on that same Feb. 9, 2017* date.

116. In other words, the malicious acts conspiratorially arranged and executed against me at <u>both</u> Southport and Elmira C.F., each mere days after my transfer, also involved Commissioner Annucci, especially in light of **his <u>impossible</u> July 26, 2016 justification and continuation of said maximum classification.**

117. *Before* I ever received said "2/25/16" classification increase reports (at 2 points in 2018; first as Discovery provision by Chemung County D.A. in March, '18, and via FOIL in Dec. '18 at Collins CF) I had the presence of mind to write to Collins C.F. Supt. Justin Thompson (Comm. Annucci's 2/25/16 wire-fraud collaborator) on April 8, 2016, mindful of the above series of 'coincidences' and asked Supt. Thompson in the heading of the 1-page letter: "Was it a communication from you or one of your staffers to this [Southport] prison that prompted my latest phony Tier III misbehavior?"

118. This would actually be the first of at least a few more acts of conspiratorial malice and fraud by the tandem of Supt. Thompson and Comm. Annucci (infra).

119. As to the *chief architect* of my unlawful and continuing imprisonment, AAG Hickey, when I attempted to repeatedly have *his* misconduct addressed, a series of numerous court officials – all but one being Irish (hence, the 'Irish Illuminati') in *addition* to Hickey – they persistently violated the most basic laws of procedure, caselaw and the Constitutions to protect him incl. 2 NDNY judges.

VI. Judges, Clerks, Court Attorneys and Four (4) Assistant Attorneys General Collaborated in Wire Fraud, Repeatedly, In the Course of Four (4) Court Actions to Continue My False Imprisonment, Further Harming My Economic Prospects and Family's, in Violation of United States R.I.C.O. Laws

A. 'Judges' MacAvoy and Baxter's Subversions of Due Process in Collaboration With AAGs

120. I attempted to have AAG Hickey's misconduct addressed in 4 courts, culminating in monstrously blatant and shocking departures from the most basic modes of jurisprudence to avoid ministerial penalty against AAG Hickey and/or relief(s) for me, especially but not solely, release.

121. My first attempt was in the NDNY <u>Shapiro</u> covert castration civil rights action, presided over (then) by District Judge Thomas MacAvoy and Magistrate Judge David N. Peeples; on Feb. 26, 2017, I wrote in frank detail to J. MacAvoy about my Jan. 9, '17 letter to AAG Hickey, its *actual* substance and unmistakably hopeful and earnest conclusion in Page 2 of it (**"But I'm going to try to live a decent life, anyway. [ ]"**, and offering to take a polygraph test while challenging his creep-ass clients to do so) – and asking him to investigate and impose sanctions on Hickey, as well as to appoint me an attorney ("I can't imagine OSI lied about my Jan. 9 letter, Feb. 19 interview and Feb. 22 'Threats and Extortion' misbehavior without authorization from AAG Hickey [at each point]."

122. I would submit nearly identical motions again and again, at least four (4) times between Feb. 24 and June 11, 2017, to Judge MacAvoy – **none of which were ruled on or even acknowledged, let alone responded to by MacAvoy, despite asking 'do not let him** [AAG] **continue to benefit'.**

123. In startling contrast, and reflective of the misconduct by Hickey I perceived, in April Mag. J. Peeples **recused himself, and AAG Hickey was removed and replaced as counsel for surgeons.**

124. They were replaced by by Magistrate Andrew T. Baxter, and AAG Shelly Krasnokutski (the *sole* non-Irish person involved out of the 4 court actions and approx.. 12 court officers *directly* involved).

125. My motions all emphasized the likelihood that AAG Hickey was driven not only out of personal offense and vengeance, but also to maintain my imprisonment and avert acquisition of an attorney by me (especially one pursuant to a contingency basis/fee and personally and financially invested) – and therefore asked him to prevent that dirty disadvantage and appoint me counsel, especially as Discovery phase was just commencing.

126. In my June 11 version, and to an even greater degree in my July motion for injunctive relief to J. MacAvoy, I cited the 2nd Circuit's assignment of counsel precedent and standard of <u>Hodge v. Police Officers</u>, every single one of whose prongs/factors I met, *especially continued confinement* (both in terms of being in prison, <u>and</u> cell confinement preventing law library attendance) *and medical complexity* – the latter of which was further established by attorney Cliff Gordon's 2016 letter to me (supra), which I attached as an exhibit to the June 11, '17 motion and subsequent ones.

127. This was in addition to the Defendants *themselves* being medical experts, my complaint having over half of its 141 paragraphs setting forth quotes from the surgeons and other medical and physical principles and occurrences **obviously beyond the ken of any lay juror**, and the extreme (indeed, <u>criminal</u>) misconduct by initial defense counsel Hickey that wrought and continued my inability to fully engage prosecution of the action and Discovery (esp. enabling me to have the surgeons deposed), as well as the extreme misconduct by Elmira CF staff (supra).

128. Judge MacAvoy, after repeatedly and interminably delaying any rulings on my 5 motions to him, **since Feb. 26, '17**, or even acknowledgment of said motions and issue (his July 2017 Text Order acknowledgment of my motion for injunctive relief [including *immediate prison release due to AAG Hickey's, O.S.I.'s and Elmira C.F.'s joint misconduct thwarting my Feb. 21 release, and Elmira staff's ongoing abuses of me through June '17, <u>esp. the June 21 staff gang assault that broke my rib</u>*] made no mention of the appointment issue), and then proceeded to put it in abeyance after the initial ruling deadline had passed and *before* defense counsel Krasnokutski filed a Motion for Sanctions or even requested permission to do so (about Oct.. 3), following Sept. 15, '17 Deposition.

129. Magistrate Baxter, during Deposition, ruled (seemingly usurping MacAvoy) I wasn't entitled to assignment of counsel and even lied and ignored the <u>Hodge</u> principle that counsel assignment should be made **"at the time of the request"**, instead claiming "we can't do it at this point", "not until trial" – despite my having confronted him with the case quotes and related facts therein.

130. In fact, on Sept. 10 I sent J. Baxter a letter detailing the above; so when he denied me *after* further elucidation thereon, it resulted in him deciding the *same* motion, after 5 days, that J. MacAvoy *delayed ruling on for over 11 months.*

131. Conversely, for another NDNY litigant whose claim involved medical facts and injury of a *lesser* degree – he lapsed into a coma for 8 days due to being given the wrong medication but suffered no continuing or permanent effects therefrom (as opposed to my permanent castration) – Michael Sanderson was not only assigned an attorney during Discovery and scheduled motion processes, but that attorney assigned was former NDNY Magistrate George H. Lowe.

132. Of course, aside from my more compelling case for assigned counsel, Mr. Sanderson is a white plaintiff, and I 'merely' Latino – as I pointed out in filings to MacAvoy, including my objections to Baxter's Report and Recommendations in favor of AAG Krasnokutski's bad-faith and perjurious Motion for Dismissal and Sanctions.

133. Speaking of AAG Krasnokutski, she would conduct herself despicably, especially after MacAvoy's extended refusals to address or even acknowledge her predecessor Hickey's misconduct from Feb. 26, 2017 through June (and beyond); among other things, she would falsely claim I 'refused' to participate in Discovery, even prior to Deposition, although I had sent her (1) a formal Rule 26 Demand for, and *provision of,* discoverable documents, and (2) at least two additional supplementary provisions, from June 11 through prior to Deposition.

134. She would further and relatedly claim, knowingly falsely, that I simply "refused" transport to Depositions on June 23 and August 12, '17, respectively, even though I was gang-assaulted on June 21 by Elmira C.O.s *resulting in a broken rib confirmed that day by the Elmira CF X-ray technician* – making it impossible to navigate a 1,000 mile bus transport, in chains, without exacerbating it or experiencing excruciating pain – and with regard to the Aug. 12 'refusal' I was informed, in writing, by a staffer (counselor Mr. Collins) that I would see the Parole Board for rescission hearing Aug. 16.

135. Further, I sent AAG Krasnokutski sworn missives and provided other documents proving it contemporaneously (the bus transports would require course of weeks, and stays at 2 prisons).

136. The latter intentional misrepresentation by this AAG was incredibly done in tandem with the same Elmira staffer, Mr. Collins, who told me in an Aug. 2 writing (which I sent to the AAG on Aug. 6 as I urged her to take into account my liberty interests and re-schedule Deposition for September) that I *would* be seen by Parole on or about Aug. 16 if no MBRs were pending.

137. In that same Aug. 6 letter to that AAG I told her the final hearing (on the June 2 MBR) had concluded *that* morning and I was expecting the Disposition "any day" – which happened to occur on the morning of Aug. 9, automatically dated "8/9/17" by the Elmira CF computer that printed it.

138. Despite my missive, she claimed and called the facility on August 9 and was purportedly told by Mr. Collins that I 'still had an MBR hearing and disposition pending' – and immediately wrote to J. Baxter to convey the falsehood that I had lied about the above (Mr. Collins refused to correct it).

139. My immediate provisions to her *and* J. Baxter of all related documents, *including the date stamped Aug. 9 Disposition*, were repeatedly ignored by them even after I used them as exhibits for my reply to the AAG's October Motion for Sanctions and to Dismiss, and with my Rule 11 Motion to have her malicious frauds sanctioned.

140. I also likewise used as an exhibit with my latter filing(s) the reply by Elmira C.F.'s Dr. Ott, the same doctor who diagnosed my broken rib in discussion with me on or about July 24, to my grievance against him for refusing to provide me protection/cushion for my broken rib, for refusing to provide me protein supplement to expedite its healing, refusing to write a recommendation for me not to be subjected to transport until healed (or at least a month), and, most pertinently, **his refusal to even provide me written proof of my injury** (justifying my June 23 transport refusal).

141. That September, '17 grievance decision, quoting Dr. Ott's diagnosis that my 10th right rib was broken, was my exhibit proving I had suffered it on June 21, with my WDNY filings.

142. I had even confronted AAG Krasnokutski and J. Baxter <u>during</u> the Sept. 15, '17 Deposition with *all* of the above facts (of course minus the Oct. '17 grievance decision confirming the broken rib) – **which neither of them refuted on the Deposition transcript** – in addition my sworn letters of June, July and August about each of the above.

143. J. Baxter would 'somehow' proceed to obtusely declare in July and August "text rulings" that I was 'obstructing' Deposition and Discovery with 'no basis' and in 'bad faith', and corruptly 'find' this in his Report and Recommendation Report urging dismissal.

144. This was aside from three (3) ex-parte discussions provably had between AAG Krasnokutski and J. Baxter that I confronted both with *during* the Deposition and in my Rule 11 Motion and Reply to the AAG's Motion to Dismiss;  Baxter reflexively denied it even as he factually, constructively admitted it, <u>on the record</u>.

145. I did the exact same with AAG Hickey's misconduct, and confronted both AAG 'Ms. K' and J. Baxter, in precise detail, with **no** refutation from them, during the Deposition – nor any facts to counter them with in their respective filings or rulings thereafter (nor in MacAvoy's).

146. Also, AAG 'Ms. K' and 'Judges' Baxter and MacAvoy each manufactured outrage with regard to one (1) court missive (questioning his interactions with AAG), and one (1) missive to AAG 'Ms. K', that involved a single curse word and insult – which was a naturally and reasonably frustrated response by a plaintiff incessantly abused under the pretext of 'ordinary' case administration while counsel<u>s</u> for Defendants were allowed to abuse and defraud this Plaintiff attempting to address his manhood and sexuality taken from him by their clients – and **was <u>solely</u> characterized by J. Baxter in Deposition as "you occasionally make intemperate remarks"** (9/15/17 Dep., P.41).

147. They did likewise with my mistaken but good faith objection to continuing with Deposition, pursuant to <u>Hodge</u> while being falsely and repeatedly denied counsel assignment with <u>no</u> extension of Discovery phase (or to re-open); they scoffed and rejected this due my "litigation experience",

although I had **never** defied a court order or faced sanctions before; indeed, my relatively minor

indiscretions in an exceptionally emotionally charged case with such conscience-shocking

allegations against Defendants – *notwithstanding outrageous misconduct by Defendants' counsels* –

paled in comparison to 'misconduct' by plaintiffs in <u>every</u> single case cited by counsels, Baxter, and,

of course, my own.

148. Finally, MacAvoy, in addition to having set forth a late November '17 text order that revealed

his <u>pre</u>determination that Defendants' counsel's motion for sanctions and to dismiss as meritorious

**(months <u>before</u> Baxter even issued his R & R report thereon)**, made no de novo findings of fact

regarding my *numerous* exceptions to Baxter's record and fact distortions (supported with facts

*disproving them*) in disregarding F.R.Civ.P, Rule 72.

149. I had explicitly accused both Baxter and MacAvoy, in missives and filings, of having done

nothing but protect Defendants' 2 counsels and Defendants themselves (also prominent Caucasians,

as surgeons), pursuant to their elitist and white supremacist Masonic Order obligations.

B. In Three Different, Consecutive State Courts, In Two (2) Contexts (Rescission and Habeas
   Proceedings) I Was Repeatedly <u>Cheated</u> Out of Reliefs That Would Likely Have Resulted in
   Attaining Freedom Sooner By A Dozen Court Officials, Including a March '18 Habeas That
   Would Have <u>Absolutely</u> Resulted In Immediate Release <u>Minus</u> the Organized Misconduct

150. On March 28, '17, I filed a state habeas corpus petition to address AAG Hickey's, OSI's and

Elmira C.F. officials' myriad acts of synchronized and patterned misconduct in canceling my Feb. 21

release and perpetuating it under palpably false pretenses.

151. AAG Mark Sweeney would represent them and proceed to file a reply which intentionally

misrepresented the underlying factual basis, in order to alter the applicable legal standard and

falsely assert that I was 'challenging the misbehavior disposition' implicating Art. 78, not habeas –

although my petition was filed weeks *before* disposition, aside from its clear substance.

152. More importantly, he would therewith file a copy of the entire hearing transcript with his reply – months later as the Chemung County court clerk, Samantha Pike, calendared and administered its progression as *if* it was an Art. 78 rather than a habeas – which **deleted CHO Siglin's Feb. 24 admission "I can't see how your** [Jan. 9, '17] **letter can be a threat or extortion.",** stated by him immediately after I read the entirety of my Jan. 9 letter to Hickey into the MBR hearing record (Feb. 24, '17 Hrng Tr., ps. 17-19).

153. Said admission by the CHO, had it not been excised, would have necessarily been reflected with Pages 19-20 of the transcript, as it followed my reading aloud of the letter – the absence of which cheated me out of the MBR hearing administrator's clear and visceral statement that the entire basis of the Feb. 21 prison release suspension, and Feb. **22** MBR to try to convert it into a rescission process, was all a continuing and known fraud that constituted illegal detention.

154. Said transcript was actually produced by a series of Elmira C.F. civilian clerks, so that one single excision of such a central statement – a provable excision as I repeatedly reminded CHO Siglin at subsequent junctures of the hearing of my reading/quotation and his verbatim response, confirmed but rationalized by him at said subsequent junctures (including March 9, ps. 20-21, *inter alia*) – was inescapably done per (phone or e-mail) contact from and collaboration with AAG Sweeney, and also reflective of extent to which the AG's office intervened and manipulated other agencies' workers to falsely continue my illegal detention/imprisonment.

155. Contemporaneously, on April 7, '17, Chemung clerk Samantha Pike executed an assignment of counsel, the Chemung County's Public Advocate Office (or 'PAO'; supra), for my pending rescission hearing, yet refrained from sending me a copy of said assignment.

156. Further and curiously, the PAO never contacted me, although it supposedly contacted Elmira C.F. counselor Mr. Collins *about* me (Mr. Collins' Aug. 2, '17 letter) – an extreme departure from conventional representation process indicating direction from AAG Sweeney and/or Chemung Clerk Ms. Pike.

157. This is further indicated by my having been contacted by *another* attorney, a single practitioner (Paul S. Barton) – obviously per contact by Chemung clerk Ms. Pike – for "appeal of your parole denial", rather than for the rescission hearing I was actually navigating, and rather than by the PAO.

158. After a few replies to that single practitioner clarifying that I was navigating a Parole rescission hearing and *not* an appeal of a conventional parole denial, Mr. Barton contacted the Chemung Court and Parole and withdrew.

159. I simultaneously and repeatedly wrote to the Chemung court about the missteps and developments and asked for counsel assignment for my pending rescission hearing, from April through July 2017, but **Ms. Pike ignored my repeated inquiries <u>and</u> refrained from directing the PAO to contact me** (a year later the PAO Chief, Paul Brennan, wrote "I was never aware").

160. I was not contacted or provided of said April 7, 2017 assignment of PAO as counsel, despite my multiple letters from Elmira C.F. during my several months there, until *after* my August 18, '17 transfer to Five Points C.F., when I was now in jurisdiction of Seneca County.

161. Said extremely belated notification also occurred mere days before my habeas was denied in a decision which ignored the most central facts of my clearly worded petition's mere 6-page Statement, even as it acknowledged but mocked "**a big conspiracy**"* .

162. Although signed by Judge Richard W. Rich and theoretically 'his' determination, it is known and common practice for the court clerk to actually write/make the determination and for the judge to simply and mechanically sign it – especially for a proceeding involving a pro se prisoner that is only conducted and decided via correspondence, with no actual in-court appearance – in this instance, Ms. Pike, the same clerk executing all of the prior proceeding departures.

163. As I was now in Seneca County, I contacted that court to obtain counsel for my rescission; in addition to the *right* to counsel for a parole *rescission* hearing established by <u>Victory</u> – one which can only be effectuated by assignment to an indigent parole grantee, and was acknowledged and executed by Chemung (though surreptitiously, with no notice to me; supra).

164. However, the Seneca Court Attorney, Barbara A. Roesch, after initially assigning the county public defender, oddly relented upon the P.D.'s erroneous claim that I was 'not entitled' to assigned counsel – and subsequently adopted this baseless and <u>Victory</u>-defying position (Sept. 19, 17 letter).

165. Ms. Roesch, on or about Oct. 25, '17, replied to my sworn rebuttal citing and quoting <u>Victory</u> and 9 NYCRR section 8002.3 and explicitly relating my indigence , but obdurately persisted I was not entitled to assigned counsel, claimed I could only be assigned counsel for appeal, and curtly and contemptuously concluded "I have nothing else to add.".

166. My next contact with Ms. Roesch occurred in December, after the faux Nov. 28, '17 hearing culminated in rescission, to seek counsel assignment for appeal of parole rescission; this would also proceed in unusual departures by her and other related officials in the months ahead (infra, Pt. VII).

167. In January 2018 I would file a habeas corpus petition in the Seneca County Court; I related the above coordinated acts by AAG Hickey, O.S.I. and Elmira C.F. to start rescission process, as well as the set of coordinated bad acts by Five Points C.F. staff and Parole Commissioners to conclude it.

168. The petition – in which I quoted the <u>Victory</u> requisite that if there was no genuine basis for rescission it "mandates reinstatement of release" – was found so compelling by then-judge Dennis F. Bender that **on March 15, 2018, he issued a "Writ of Habeas Corpus"** <u>**designating March 23, 2018, 11:30 a.m. for an in-court/corporeal hearing requiring my transport and production therefor**</u> **at Seneca County Court**.

169. In the late afternoon of March 22, one day prior to the already-ordered hearing, Rochester AAG Ted O'Brien filed a perjury-infested reply with eleven (11) material, intentional lies to falsely undermine my habeas petition.

170. Despite his bad-faith filing, under CPLR 7008 and 7009 it merely raised issues of fact central to the matter, and, in pari materia with Judge Bender's March 15 Writ issuance explicitly scheduling the March 23, '18 in-court hearing and my production therefor, **I was entitled to the hearing**.

171. However, in addition to his last-second, eve-of-hearing filing, AAG O'Brien obviously phoned or e-mailed Seneca Court attorney Ms. Roesch to recruit her to sabotage the March 23 hearing in light of the immediately subsequent events.

172. On March 23 I was not produced for the <u>Bonano v. Colvin</u>, Seneca Index #51911 matter.

173. Further, on that same March 23 date Ms. Roesch sent a letter to respondent, Supt. Colvin, informing him the March 23 hearing ordered by Judge Bender had been "cancelled" (presumably by fax-machine) yet *refrained* from sending a copy to me, the plaintiff, though I initiated the action; I did not find this out until over a month later, when I received the facility decision on the grievance I filed for not having been transported to Seneca Court on March 23).

174. Unaware of the above, within the next 5 days I submitted 3 filings to the Seneca Court and AAG O'Brien: (1) an inquiry as to why I was not produced on March 23 in Seneca Court; (2) a motion to enforce the Writ issued by J. Bender and detain respondent Colvin in the interim; and (3) a reply directly refuting O'Brien's sole March 22 filing, identifying and disproving all 11 of his lies.

175. Neither the Seneca Court/Ms. Roesch nor AAG O'Brien ever replied to, or acknowledged, any of those filings.

176. On April 4, 2018, a decision written by Seneca Attorney Ms. Roesch and signed by J. Bender (who was days away from retiring, I later learned) issued *dismissing* my petition.

177. Said decision *substituted* a 2001 N.Y. State Court <u>Victory</u> case citation – one I made *no* reference to in any of my filings – for the 2016 U.S. 2nd Circuit's <u>Victory v. Pataki</u>, 814 F.3d 47 citation I *actually* made in my initial petition and other filings, and which I quoted at length that should have dictated my release under my identical situation and related facts.

178. Perhaps more importantly, **no mention was made of the March 15 issuance of the Writ that ordered and scheduled the March 23, '18 corporeal hearing** – nor why it was canceled or rescinded despite the March 23 cancellation letter sent *solely* to respondent, Supt. Colvin.

179. I proceeded to twice submit CPLR 2121 Reargument Motions to Seneca Court, the second one after Ms. Roesch rejected the first one as "not in compliance" as I did not simultaneously prove or make service of a copy upon AAG O'Brien; extremely ironic and outrageously improper as she had no qualms about sending a copy of the March 23 hearing cancellation letter solely to O'Brien and his client even as she refrained from providing one to me – or even answering my March 24 to 28 filings and inquiries.

180. Ms. Roesch never replied to, nor even acknowledged, my second Reargument motion although my DOCCS Monthly Inmate Account Statement of May, 2018, reflected that on April 24 she lodged a filing fee encumbrance for it.

181. Further, in her reply letter that accompanied her return of my *first* Reargument motion, she actually attempted to dissuade me from continuing to pursue Reargument by referencing my "appeal [of the habeas dismissal] pending".

182. On April 18, '18, contemporaneous with my first Reargument motion to Seneca Court, I filed a "Notice of Appeal" with the N.Y. State Appellate Division, 4th Department; no reply thereto.

183. On May 17, '18, I sent a letter of inquiry regarding my April 18 Notice of Appeal, and additionally swore and alleged that I had never appealed from a state habeas corpus and was cell confined, and therefore unaware of the exact procedure for appealing a lower court habeas denial.

184. This would result in several filings from myself to the 4th Dept. court, and replies from 2 court attorneys (Kim Taylor and Lawrence X. Dalton), alternately over the course of the next 10 months.

185. Among the filings I submitted, mostly in immediate response to prompts, were a Motion to proceed in forma pauperis (though my April 18 Notice of Appeal and May 17, '18 inquiry clearly addressed my indigency), *twice*, and a Motion for Appointment of Counsel that involved a few steps required for "proper service" (as advised by Ms. Taylor in a September, '18 letter).

186. This does not even yet include my July 22 submission of a 33-page appeal brief, with 100-page Appendix, along with a sworn cover letter **detailing my indigency to explain why I could not even produce and provide a copy to the AG's office** (but explained therein I had provided them a "Notice of Filing") – which was returned to me by Mr. Dalton with an Aug. 8, '18 letter insisting I had to "10 copies of the record, 10 copies of a [the] brief, proof of service of 2 copies, [ ] and the filing fee ($315)" with no acknowledgment of the indigency I detailed to him nor the alternatives and exemptions available to me due to said indigency, for a habeas corpus.

187. I literally made monthly efforts and complied with all directions (other than the above one, which was impossible for me) by Mr. Dalton and Ms. Taylor, but it was **not until a January, 2019 letter**, from Ms. Taylor, that any suggestion or mention was made of a 'requirement' of me to file a (or the) Notice of Appeal, within 30 days of the habeas denial, *with the county court that denied it.*

188. Until January 2019, no mention was made of this 'requirement' **despite my Apr. 18, '18 submission of it directly to their own 4th Dept. court, and my May 17 follow-up letter**.

189. A few more exchanges took place after that final January letter from Ms. Taylor, involving another 4th Dept. Court Attorney, Mark Bennett, before an ultimate Apr. 16, 2019 letter from Ivan Lee, on behalf of 4th Dept. Chief Judge Gerald Whalen, essentially dismissing any appeal or attempt to by again zeroing in on then 'requirement' withheld from me for the first 10 months.

VII. Following My Transfer From Elmira CF to Five Points CF, Five Points CF Senior Counselor Ms. Seananne Courtwright, the Eventual Rescission Case Presenter, Repeatedly Contacted the Parole Commissioners in the Months Leading Up to the Nov. 28 Rescission Hearing and Rescission Witnesses in Back Channel Communications – Resulting in a Foul Farce to Rescind

190. I was transferred to Five Points CF on August 18, '17 from Elmira C.F.; starting on Sept. 11, 2017, already-assigned and eventual rescission case presenter on behalf of DOCCS, Senior Offender Rehabilitation Counselor (hereinafter 'SORC') Ms. Courtwright, began to have several 'back-channel' communications in preparation for her presentation of the rescission case against me; I would not obtain them until I filed an early December, '18 FOIL request after the conduct and statements by the Parole Commissioners who presided over the Nov. 28, '17 rescission 'hearing' (William Smith Jr. and Thomas J. Berliner) made it clear they had been communicating with S.O.R.C. Courtwright, and received at least one of my documents from her, surreptitiously.

191. On Sept. 11, '17, SORC Ms. Courtwright (hereinafter 'Ms. C') e-mailed OSI's John Walters, the one who conducted the Feb. 19 Sunday interview with me at Elmira C.F., then lied (in his Feb. 19 report and initial/'direct' MBR hearing testimony that I 'told' him I was still/presently wishing to physically harm the surgeons who covertly castrated me – as he essentially admitted during my cross examination of him during the hearing (supra; March 9 MBR Tr., ps. 7-9).

192. SORC 'Ms. C' was scheduling him as a witness and stated, inter alia: "Elmira transferred *this nice Rescission Hearing to us.* [ ] Collins/Titus [ ] had you listed as a witness. [ ] Not sure how you want to work testimony? [ ] at the [Five Points] facility [ ] Or you could come up to Rochester."

193. Mr. Walters' response reflected that he was tracking prison developments with me.

194. More importantly, Mr. Walters would never appear at the Rescission 'hearing' of Nov. 28, **nor would any other witness; i.e., <u>no testimony or other evidence in support of rescission</u>** (infra).

195. Next e-mail contact by SORC 'Ms. C', again surreptitious, took place on October 6, '17; she had earlier that day dispatched her minion, ORC Sandra Hill, then assigned as Elmira C.F.'s Keeplock Counselor, to ask me for my documents reflecting my futile attempts to obtain counsel and pertinent replies (as later told to me by SORC 'Ms. C' on Dec. 6, '17, which I quoted in a grievance).

196. ORC Ms. Hill, also per the direction of her supervisor (SORC 'Ms. C') asked me for said documents *under the pretense of seeking to 'help' me obtain counsel* ("It's time I made a few calls!", she chirped) – then proceeded to give 'Ms. C' said letters.

197. 'Ms. C' then proceeded to isolate the Sept. 19, '17 letter *to me* from Seneca Court Attorney Ms. Roesch in which she falsely claimed I was 'not entitled' to assigned counsel for Rescission and that she/her court 'does not do that', **and sent it to the Parole Board and Commissioners to signal them that I would be without counsel for the Rescission hearing** (i.e., 'fresh fish on the line!').

198. She additionally consulted with them and wrote this in her Oct. 6, '17 e-mail to ORCMs. Hill:

"Per [Parole] Counsel's Office, the Court has the final say. Counsel's Office advised him to contact PLS or the NYS Bar Associate [sic] and request counsel" – a message never given to me by 'Ms. C', ORC Ms. Hill, nor by the Parole Board (upon which <u>Victory</u>, 814 F.3d 47, 61 places the burden) via mail nor during the Nov. 28 hearing.

199. In fact, when ORC Ms. Hill returned my documents to me the next day and I asked her if she was able to get me an attorney, she solely said: "No; sorry. No such luck".

200. On Oct. 12, '17, 'Ms. C' e-mailed colleague Ms. Keery and falsely wrote I "had his OD [Open Date] suspended *after receiving some tickets*" (my release was suspended on Feb. 21, my first 'ticket'/MBR was written and received on Feb. 22, **after suspension**, and the other 4 MBRs all postdated release suspension *and even rescission referral by months* – and my release was a SET DATE of Feb. 21).

201. Ms. C's next e-mail contact (assuming other relevant e-mails were not withheld from me by the Elmira CF FOIL office) was on Oct. 17, '17 from her minion ORC Ms. Hill *to* her: "Just FYI. I don't know if this matters, but his [my] PB on FPMS is December, **but we said November because Oliver needed to testify.";** "Oliver" never did testify, despite 'needing' to, nor did anyone else.

202. Finally, SORC 'Ms. C', on Nov. 14, was e-mailed by the new Keeplock Counselor (who replaced Ms. Hill almost immediately after she surreptitiously provided my Sept. 19 Seneca Court letter to 'Ms. C'), Ms. Ault and informed: "Inmate [still] does not have a attorney for the 11/17 PB."

203. On Nov. 28, '17, I saw the Parole Commissioners Smith Jr. (who curiously had appeared at *every* one of the prior parole appearances I had went to since 2016, though they all were previously postponed – including the odd May 14 postponement though there was no reason to do so) and Berliner.

204. As reflected in page 3 of the Nov. 28, '17 Parole Rescission transcript, Commissioner Smith 'asked' me if (1) I had an attorney, and (2) if I wanted one, even though he had my Sept. 19, '17 letter from Seneca Court Attorney Ms. Roesch in his hand (sent to him by 'Ms. C', and therefore *already knew* the answer to both were "No", and "Yes", respectively.

205. In fact, his *very next* transcribed statement, as he held the letter aloft (as video reflects):

"**And actually the County responded that they don't provide an attorney**." (p.3, L.13-14).

206. Even though I clearly responded "I would have preferred that [an attorney]", and even attempted to use my unprovided *right* to an attorney as a bargaining chip to obtain AAG Hickey as a witness to cross examine (though both are rights under <u>Victory</u> and NYCRR), the Commissioners would thereafter completely lie in their Dec. 1 Rescission decision: "**Inmate appeared at the hearing without counsel <u>intent on representing himself</u>**".

207. They also denied me the right to summon AAG Hickey for cross-examination even after I clearly explained his role as the Feb. 17-21 release suspension puppetmaster (P.R. Tr., ps. 3-4), despite my having made that request to the Parole Board (and Elmira C.F.) in writing June 6, 2017.

208. In fact, there was not one witness or testimony presented by anyone other than my own, and no evidence by anyone other than mine; DOCCS rescission case presenter, 'Ms. C' (literally snuggled with Berliner throughout the hearing, reflected on video), also did not present a single item of evidence to support her case predicated solely on the MBR guilty determinations.

209. Further, she didn't even submit the MBR dispositions, transcript nor any related witnesses; this is aside from the MBRs excepting the Feb. 22 one all postdated the March 29, 17 referral for rescission by months (the first of the others was from May 27, '17).

210. Even the Feb. **22** MBR could not possibly have <u>pre</u>dated the Feb. <u>21</u> release suspension; this is probably why the Commissioners and SORC 'Ms. C' each falsely stated and backdated the Feb. 22 MBR as having been written on "1/19/17" – even after I explicitly corrected them ("Feb. 22") during the hearing.

211. I also provided 39 pages of Exhibits and factual/legal arguments, during rescission hearing, that revealed <u>all</u> the reports as **"fabrications"**, stated by Charles Greenberg, Esq (supra).

212. Said Exhibits and arguments included CHO Siglin's Feb. 24, '17 admission that **"I don't see how your** [Jan. 9, '17] **letter can be a threat or extortion."** (P.R. Tr., p.11, L. 6-9) and the March 9, MBR hearing transcript portion (ps. 7-9, supra) in which OSI's Mr. Walters essentially admitted he lied in his Feb. 19, '17 report under my cross-examination.

213. Finally, I also pointed out that as Commissioner Smith Jr. had been present at the Dec. 14, '16 panel that chose to free me during which I mentioned my anger with the surgeons who castrated me, and as the prior more explicit anger was related to Southport C.F. MHU staff, including psychiatrists on video (all released to and reviewed by said Dec. '16 panel prior thereto) – as I wrote in February, 2017 letters to Parole and in my rescission appeal brief – the Jan. 9 letter about the surgeons could *not* be deemed "new information" pursuant to Victory.

214. Yet my appeal was denied via numerous factual distortions and legal contortions by a panel of 3 'review' Commissioners whose signatures were illegible and refused to identify themselves upon my subsequent inquiry and FOIL requests, furthering the extended fraud and imprisonment.

VIII. I Was Suddenly Transferred Out of Five Points and Designated For Collins C.F., Though I Was Days Away From Parole Appearance There – and Was Immediately Subjected to 12 False MBRs Within the Following 120 Days and Subjected to False CR Rescission, Further Delaying My Release, All Engineered By the Tandem of Collins Supt. Thompson and Comm. Annucci

A. Immediately After *Another* Odd-Timed Transfer By Annucci&Thompson, I'm CO-Assaulted *Again*

215. On or about September 29, '18, I was suddenly packed up for transfer by Five Points Supt. Mr. Thoms  and designated for transfer (back) to Collins C.F. as authorized by Comm. Annucci, and agreed to by Collins C.F. Supt. Thompson – the latter two comprising the same tandem that made the sudden 2/25/16 security classification increase decision and designation for Southport after which my arrival almost immediately resulted in a staff gang assault against me and a false 'assault on staff' MBR to cover it up (supra).

216. This resulted in nearly instant déjà vu'; on October 2, the day after my transit stop at Auburn C.F. I was assaulted by a CO, Mr. Chapin (*and* other COs that ran over), then falsely charged with 'assault' though I, at 53 yrs, 5'5", 145 lbs, was days away from seeing the Oct. 14, '18 Parole Board.

217. Moreover, I had my hands cuffed behind my own back, and the C.O. (6', 250lbs.) was behind me while he held the short chain interlocking my rear-cuffed hands; he therefore resorted to ridiculously claiming I "*swung his head*" at him (which another C.O., Mr. Vincent, *falsely* confirmed).

218. I was nevertheless held at Auburn CF and made to miss the Oct. 2 bus to Collins C.F., and kept there for a month, also forcing me to miss the Oct. 14 Parole Board.

219. While there, my letters to all 'Big 3' Auburn CF executives (the Supt., Mr. McCarthy, Dep. Supt. of Security and the Dep. Supt. of Programs, Ms. Shanks), as well as Comm. Annucci, were all disregarded and the palpably phony 'assault' charge against C.O. Chapin 'by' me was feigned to be legitimate – and of course resulted in another guilty disposition.

220. The Auburn CF CHO(Mr. Bauersfeld), like every one I've gone before, including CHO Siglin – having been *a former prosecutor* – defied my overwhelming evidence and the N.Y. State Smith v. Vega "reasonable evidence found to be so by reasonable minds" and 2nd Circuit's Luna v. Pico similarly stated MBR evidentiary standards to find me guilty (despite my cites & quotes therefrom).

221. He also ignored my citation of Matter of Malone 105 AD2d 455 case where then Comm. of DOCCS, Thomas Coughlin, articulated the C.O.s' **"Code of Silence"** compelling C.O.s to refuse to divulge misconduct by other C.O.s – especially assaults against prisoners – and to automatically corroborate fellow C.O.s claims of innocence and misbehavior by prisoners, even if false.

222. SHU Director Venettozzi did likewise on appeal, even with Prisoners' Legal Services counsel Megan P. Welch having submitted a supplement on my behalf *further* exposing it as false.

223. During that month at Auburn CF I also wrote 3 letters to Comm. Annucci concerning (1) his authorization of my late September, '18 transfer merely days away from my scheduled Parole Board appearance at Five Points C.F.; (2) the obviously improper and abusive related decision to transfer me back to Collins C.F., where the Jan. 15, '16 weapon/'lock-in-a-sock' was *planted* (by C.O. Mr. Seerieter per order of Sgt. Mr. Costello) under my mattress and whose Supt. Justin Thompson falsely and maliciously arranged on 2/25/16 to raise my classification – *with Comm. Annucci himself* – for designation and transfer to Southport (where I was gang-assaulted by staff days later); and (3) the palpably phony Oct. 2,'18 'assault on staff' (C.O. Chapin).

224. Please also note, Comm. Annucci was *acutely* aware of the N.Y. State C.O.s' "Code of Silence" established by Matter of Malone (supra); Mr. Annucci started his *38 year career with DOCCS* in 1983 as Chief Counsel – the same year that then-Commissioner Coughlin testified to the nearly-always automatic yet often false denials of abuse or assault of prisoners by C.O.s and fellow C.O. witnesses.

225. Nevertheless, Comm. Annucci maliciously or deliberately indifferently allowed the Oct. 2 'assault on staff' MBR to progress to inevitable, agenda-driven guilty disposition, and the subsequent transfer to Collins C.F. as well.

226. Said transfer not only further delayed my then-scheduled Oct. 14, '18 parole board at Five Points, but also prevented my Time Allowance Committee ('TAC') hearing from taking place there (to determine how much of my 'good time' I would be granted).

B. Upon My Return to Collins C.F., I Was Set Upon By Execs and Staff Via Maliciously False MBRs

227. My Conditional Release Date of March 19, '19 necessitated a hearing by Nov. 19 for DOCCS to deny me release by then under statutes and regulations, and, even if a hearing at Five Points resulted in denial thereof, the only possible basis therefor, my 'failure' to take and complete A.R.T.

(Aggression Replacement Therapy) would have been instantly remedied as Five Points C.F. gave long-term Keeplock prisoners there (which I was the entire 13 months I was there) access to said program <u>while</u> in confinement.

228. This principle of access to recommended rehabilitation programs for misbehavior-confined prisoners at Five Points C.F. was actually a requirement that resulted from the 2016 SHU class-action lawsuit settlement arising from the <u>Peoples v. Fischer/Annucci</u> civil rights case (supra).

229. All N.Y. State prisons were to comply with this, but while Five Points did so, Collins CF did <u>not</u>, according to their *own* converse and renegade written SHU policy – and allowed by former decades-long DOCCS **Chief Counsel** Annucci, *presently* Commissioner.

230. This is aside from my having confronted Comm. Annucci with these facts via letter and eventual appeal from denial of good time by Collins CF's 'TAC' (infra).

231. In any event, I eventually arrived at Collins CF on Nov. 30, '18; on the bus ride there, one of the 2 transport officers assigned to that bus (Caucasian, with an Italian surname) complained that Comm. Annucci had contacted the C.O.s "with time", urging them to mentor the new (or newer) C.O.s to *continue* the 'Code of Silence'; but he and they were loathe to do so "*with the <u>new breed</u>*".

232. Upon my arrival and immediate entry into their SHU there, *the same* Sgt. Costello who had the Jan. 15, '16 weapon planted under my mattress, was that day's and shift's SHU supervisor to accept and 'greet' me.

233. Sgt. Costello examined me to compile the SHU Entry Questionnaire, and based on the answers I gave him, he ordered me single-celled at the otherwise "double-bunked" SHU there.

234. The next day, Nov. 1, '18, Collins CF's Supt. Thompson, Dep. Supt. of Security George Poff, and Dep. Supt. of Programs Karen Kelly passed my cell "on tour" along with Sgt. James Filigheras.

235. I confronted Supt. Thompson about his obviously improper decision to accept/'house' me as a prisoner there in light of all abuse(s) I was subjected to the previous time during this prison term that I was in his prison (2015–2016), culminating in his 2/25/16 arrangement with Annucci to raise my classification and earmark me for Southport (when I had only *days* left to serve for the planted weapon) – *for* the Southport staff gang assault.

236. Incredibly, he claimed "I have nothing to do with that" (presumably this transfer), then ordered me to remove my family photos from the wall and proceeded to direct and engineer a palpably vindictive and outrageously false Tier III "Disturbance and Harassment" MBR by Sgt. Filigheras, solely due to my mere refusal to remove the photos, that listed said 'Big 3' Collins CF execs; essentially, the main substance was that my mightily loud refusal to remove the photos from my cell wall made all operations in the SHU (*if* not the entire prison) somehow grind to a halt.

237. Of course, the reason for Supt. Thompson's approach of my cell (I *summoned* him) and the substance of my discussion with him *preceding* his trifling non-sequitir of a photo-removal order were conveniently omitted from the MBR.

238. For the MBR hearing the execs appointed an obviously agenda-driven, biased Lieutenant as the Hearing Officer ('HO'), Captain James Pickering; the surveillance video I ordered of the *actual* interaction between the execs, and thereafter the Sgt. (who simply repeated the cell wall photo-removal order) somehow was devoid of audio, although all of the SHU cameras were infused with audio capability – and the videos that were produced at Collins for approx.. 6 other MBR hearings thereafter would all have audio.

239. Additionally, he would conjure a contrived basis to have me removed from the hearing to prevent any more incisive objections and discrediting of staff's abusive MBR, and more easily find me guilty: the "tone" of my voice.

240. That MBR would be the first of eleven (11) phony MBRs I would be charged with within the next 90 days; they would be used to *further* delay my Parole reappearance (already delayed from October due to the Sept. 29 transfer and Oct. 2 phony 'assault on staff') from November '18 to Jan. '19, and again from Jan. '19 to May '19 – and to further justify the TAC denial of my March 19, '19 Conditional Release (and *all* good time).

241. Nearly every one of those phony MBRs were directly linked to the Collins 'Big 3' execs., suspiciously timed and provably false – and presided over by Collins CHO Mr. Martin (like every other N.Y. State prison's CHO, a former prosecutor).

242. This included one, merely a few days after the 1st and 2nd ones, of Nov. 6, '18; in preparation for the TAC that was now to be held at Collins CF ("Nov. 14", as stated in their Nov. 2 "Notice" of it), I was allowed to select a Collins C.F. employee from a list simply setting forth their surnames and 'selected' (rather randomly, other than asking the C.O. holding the list to identify the civilians) a Teacher, Ms. Miller (Shannon).

243. She approached my cell twice on Nov. 6 (after consulting with DSP Kelly), and, cognizant of TAC hearing rules in advance (I had already obtained Title 7, Chptr 5 of NYCRR/DOCCS Dir. #4932), I simply listed the items of documented evidence I needed in light of the Nov. 2 TAC Notice's 2 false justifications for their predetermination refusing me good time ("disciplinary history and negative programming"); per TAC statute they were required to be produced and she promised to do so.

244. Among the items and situations I discussed that inured to my advantage was my MHU records reflecting that I was diagnosed with severe clinical, chronic depression and on 80 mg of Prozac since June of 2016 due to (1) the 2013 covert castration (that thereafter dawned on me as *permanent*), and (2) the phony 1/15/16 Weapon and 3/21/16 'assault on staff' MBRs.

245. Ms. Miller disgustingly and intentionally distorted that records request and discussion as *if* I meant it and she perceived it as a 'come-on' by me; this included her complete lie that she "told" me to "stop" discussing it and it was 'not relevant' (cf., to therefore take my CR and any good time to continue my imprisonment would per se encroach on cruel and unusual punishment).

246. Ms. Miller also deceitfully drew a non-existent connection to, and continuation of the 'come-on' to a notation I made on the bottom of the TAC Assistance Report that was to be given to the Collins Execs: "I'm satisfied with the assistance provided me by the lovely Ms. Miller"; I *solely* made that notation because she took copious notes as I mentioned the forms of evidence and reports I listed (including glowing program evaluations of me by staffers at other prisons) – or at least feigned doing so (she interviewed me as we stood on opposite sides of a locked cell door) – and promised hearing delivery, so I wanted to execute and *terminate* any further dealings with her.

247. But CHO Martin would ignore all of this to find me guilty, even after he laughed in acknowledging the absurdity of my mentioning the devastating impact of the covert castration (sterility and extreme erectile dysfunction) as possibly being a 'come-on' ("What kind of a 'come-on' could that possibly be: 'Hey baby, you should get with a soft guy'?", I pointed out), acknowledged my point that I characterized her as "lovely" meaning "in manner" ("She was polite and was taking all kinds of notes as I spoke") and her unattractiveness *physically*.

248. In addition, I pointed out to him that in a Nov. 6 letter I wrote to DSP Kelly (responsible for the TAC along with DSS Poff and Supt. Thompson) I referred to Ms. Martin as "patient, lovely".

249. However, though he purported to believe me guilty, he conversely 'penalized' me with a "*counsel and reprimand*"; meaning not a day of confinement, therefore no actual punishment – completely inconsistent with any belief I was somehow sexually regaling or propositioning her.

250. CHO Martin also ignored the direct connection that this Nov. 6 MBR had to the 'Big 3' Collins CF execs as they were all responsible for TAC administration and personally invested in *my* TAC in particular – and as they had inarguably directed the phony Nov. 1 one, one day after my arrival.

251. Please also note, within my Nov. 6 letter to DSP Kelly (aside from grievances and earlier letters to her) I referenced (1) that my actual program participation was actually positive; (2) most of my MBRs were fabricated arising from my advocacy and outspokenness; (3) I had never refused participation in A.R.T., (4) I was placed in ART (by DSP Kelly *herself*) in Dec. 2015 and I participated **until Jan. 15, '16, <u>at which point Sgt. Costello and C.O. Seerieter combined to plant the weapon in my cube</u>** – which resulted in my automatic removal from ART and placement into SHU that day (and basically continued unabated by staffs); and (5) DSP Kelly was the <u>only</u> prison executive out of <u>8</u> prison administrations to decide (<u>un</u>recorded) I 'needed' A.R.T. before Nov.14.

252. I finally also reminded her of TAC rules that any evidence and related verbal points I had to support my position *during* the hearing "must be considered" by the TAC (under NYCRR), and that the TAC hearing should be at least "tape recorded" as all *lesser* behavior-related hearings which implicate liberty interests, Tier III MBR *and even Tier II hearings*, are (I would later also find U.S. Supreme Court caselaw stating requirement of good time hearings to be recorded thoroughly "to allow objective review" by courts thereafter) – in addition to listing the evidence I asked of Miller.

253. On Nov. 9, '18, DSP Kelly replied to my above-cited and quoted Nov. 6 letter and stated:

"I have forwarded your letter to DSS Poff who will be chairing Time Allowance Committee in November. **You are encouraged to share your concerns at your appearance.**"

C. A Sham Nov. 14 TAC 'Hearing', Letters of Objection From Me That Night, and Retaliation Nov. 15

254. On Nov. 14, I was brought to the SHU conference room for the hearing; despite the TAC statutes and DSP Kelly's Nov. 9 missive, I was only allowed to speak a single time at length.

255. I elevated the folder full of documents I had brought with me and cited and quoted the NYCRR Title 7 Chptr 5 sections dictating that he at least hear me out, and he yelled (inter alia) **"There is no hearing!",** and "You need ART! I'm telling you what it is!".

256. I was solely able to address the fact that the Dec. 14, '16 Parole Board made a release decision even though I had not completed ART and had 3 Tiers in 2016, none reversed at the time, including: (1) the 1/15/16 weapon charge (the MBR upon which I was removed from ART), (2) the 3/21/16 weapon charge, and (3) a November "leading a demonstration"; a determination including **Parole <u>Chairwoman</u> Tina Stanford** – one obviously establishing I did *not* need ART.

257. I was nevertheless thrown out of the hearing despite not having attempted to do anything other than advocate for myself and present facts favorable to me and documents supporting them; this was stated by DSS Poff himseld in the TAC Hearing Report and Decision: "Inmate was told he needed ART. He became argumentative and was removed from the hearing."

258. Further, his sole focus on ART both before and during the hearing also violated NYCRR T.A.C. section requiring that decisions "<u>not</u> be made automatically".

259. Angry with the extreme abuse of process, I related all of the above that night in a Nov. 14 letter to DSP Kelly which also listed DSS Poff and Supt. Thompson, warning them that if they did not bring me back before the T.A.C. and provide me an <u>actual</u> hearing I would take the abuses to court.

260. And, the day before, Nov. 13, I had submitted the W.D.N.Y. IPF Form which requires the prison Inmate Accounts clerk to fill in the statement of account average for prior 6 months, to Collins administration; unfortunately, the caption read <u>Bonano v. Costello</u> – making it clear that I was already about to file suit against Collins CF; further and relatedly, I had also submitted a Nov. 11 request to Collins' FOIL officer, SORC Paul Gallagher, for the Collins employee roster.

261. The next day, Nov. 15, '18, would start with then-SHU counselor Erin Regan approaching the cell door to speak to my 'bunkie'/cellmate, Gregory Craig (despite the Oct. 30 decision by the SHU Sergeant mandating I be single-celled, Sgt. Filigheras took it upon himself to impose double-bunk and in the immediate aftermath of the palpably baseless and vindictive Nov. 1 MBR decided to humiliate me by placing me in the cell with Craig, a serial pedophile, rapist and sexual predator).

262. I solely asked her if I could be given a copy of the TAC hearing recommendation/report; not only was she one of the 3 counselors comprising the TAC the previous day during my hearing, she was also assigned to me as 'my' counselor by virtue of my SHU confinement, but she would write a maliciously false MBR claiming I told her I knew her address (obviously inspired by my Nov. 11 FOIL request for the employee roster to her supervisor and facility FOIL officer, Mr. Gallagher) and was going to give it out to all the other prisoners.

261. Within an hour of Ms. Regan's cell visit (still Nov. 15), a few C.O.s were sent to 'my' cell and informed me that a cell search was ordered and needed to be conducted; this was odd as I had just arrived 2 weeks earlier, all my property was searched thoroughly by SHU officers *before* I could bring any of it to the SHU cell, and I had not exited my cell for any reason since then.

262. Even odder was their decision to remove Craig and I from the cell (15 cell) and walk us to another one in the gallery next door; *every* other search I had ever been subjected to or seen in the SHU at Collins simply involved ordering the cell occupant(s) to step out into the recreation pen that connects to the cell's rear.

263. However this was a ruse to fabricate an incident; a few minutes after Craig and I were placed in the other cell (11 cell) **a smirking Supt. Thompson passed by**, but when I sought the 4001B Form that *must* be filled out and submitted by a senior administrator for an SHU cell search (per DOCCS Directive) via FOIL, I was told in writing that "*it does not exist*".

264. After spending about 45 minutes searching the cell (Craig had nothing but 2 sets of greens and a single folder with a few documents, and I had nothing except my own; although I had a couple stacks of law work, it was the same documents searched less than 2 weeks earlier), Craig was returned to 15 cell.

265. I was then retrieved from the cell in handcuffs and waistchain (as is mandated when bringing an SHU prisoner out of a cell), brought back to 15 cell, and after the waistchain was removed (but with the handcuffs still on) I was directed to step into the cell.

266. However, all of my legal documents were loaded onto a cart outside of the cell, in the hallway, about 15 feet away – though the officers (approx.. 4 of them) had spent 45 minutes in the cell.

267. Stunned to see my papers loaded as if to transport them elsewhere (**completely unprecedented as search 'procedure'),** I simply turned half a step from the open cell door and solely asked "You're taking my law work?" – and 3 C.O.s shoved me into the cell *and* entered into it.

268. The C.O.s proceeded to assault me *while* restraining me, and, though I was still, they they repeatedly yelled into their radio "Stop resisting!", obviously to convey the false auditory impression that I was doing so; while the SHU hallway was ringed with cameras with audio, there are no cameras that can show anything *in* the cell.

269. I first responded by yelling "I'm not resisiting!" a few times, but after they continued restraining and assaulting me, and it dawned on me that the entire thing was a malicious ruse by them, I became furious and repeatedly called them "cowards!" and "pussies!", in addition to yelling at them to fellate me (in the vulgar vernacular); I did so as they now dragged me back *out* of 15 cell.

270. The next day I was served with Ms. Regan's false MBR and, of course, one by the C.O.s, authored by C.O. Donald Jones who lied and claimed I kicked him in the chest.

271. Unfortunately for ORC Ms. Regan, I was able to *prove* her MBR was a complete lie; I showed CHO Martin (who was oddly made the hearing officer for *both* phony Nov. 15 MBR hearings jointly) the Nov. 11, '18 F.O.I.L. request for the Collins CF employee roster that I sent to Collins FOIL Officer/SORC Mr. Gallagher, "Ms. Regan's supervisor", and pointed out it was obviously relayed to Ms. Regan by her boss to prompt the phony 'I know your address and going to tell the other inmates' statement attributed to me'.

272. I then showed the CHO Mr. Gallagher's FOIL reply and the receipt of my purchase of the roster and its provision *demonstrating* that I did not receive the roster until Nov. 16 – the day after the phony harassing statement falsely attributed to me by her on Nov. 15.

273. This was in addition to pointing out that the only 2 items of employee information I asked for in my Nov. 11 FOIL request was for (1) the name and position of each employee, and (2) the number of years each was employed at Collins CF; *no* request for employees' home addresses "and I can't imagine that employees' home addresses can even be given to prisoners – aside from my having no interest in knowing that".

274. In reply to the CHO's query "Why did you want the roster?", I frankly stated "After all the foul shit that was done to me the last time I was here [supra], and after the first few phony tickets [MBRs], I needed to know everyone's names and positions in anticipation of litigating whatever abuses that occurred and would occur".

275. I also sought the video (with audio) of the <u>actual</u> exchange between Ms. Regan and I knowing it would *also* discredit her MBR, but it was conveniently "unavailable"; nevertheless, my documents and indisputable arguments compelled CHO Martin to find me not guilty (the 3rd time out of 11MBRs) and dismiss it.

276. However, CHO Martin would obtusely find me guilty for the phony "assault, harassment and disturbance" MBR by C.O. Jones – even after my cross exam yielded Jones' admissions that he was holding my legs down by the ankles while I was face-down and flat on the floor through the placement of leg shackles on me at 'the time' of the fictitious kick.

277. The guilty finding also occurred despite the CHO's acknowledgment *during* our viewing of the video that when I turned **I was solely heard asking about my legal work loaded on the nearby cart, unaccompanied by any 'act of aggression'** (which he altered and diluted in his disposition).

278. I also pointed out that although the COs (including Jones) repeatedly (*but falsely*) yelled "Stop resisting!", no such exclamation or declaration was made about a 'kick to Jones's chest'; at that point CHO Martin prompted Jones "You didn't say that he kicked you?", to which Jones replied "Yeah, I did." – which our collective video viewing/hearing of the entire sequence had *already* disproved.

279. Finally, CHO Martin dismissed my inescapably logical argument that "**the same people that obviously coerced Ms. Regan to write her phony ticket, the 'Big 3' Collins execs, obviously did so with the Nov. 15 [search, ruse and subsequent] one by C.O. Jones**" – accompanied by showing him the Nov. 14 letter to the execs complaining of the TAC hearing farce and pointing out their connection to virtually all of the other MBRs (esp. Nov. 1&6) that he presided over or knew of.

280. SHU Director Venettozzi, as customary, also ignored all these evidentiary/legal deficiencies.

D. Malice of Collins Administration, Both Past and Present, Confirmed *and* Continued By MHU Chief

281. Contemporaneously, my Bunkie, serial pedophile/rapist/predator Gregory Craig, **despite having *refused* his recommended/mandatory (sex offenders) program, and, similarly on the verge of TAC and Parole Board hearings, was allowed to serve his confinement without being subjected to phony MBRs to falsely impede possible prison release, but he was *Caucasian.***

282. But perhaps nothing served to establish the malicious perpetuation of false imprisonment by Collins CF staff more than the MBR of about Feb. 10, '19 written by Collins Mental Health Unit ('MHU') Director Ms. Garland, mere days before my re-scheduled February parole board appearance.

283. This is the same Ms. Garland who, *immediately* following a video-conference I had (on or about Dec. 17) with a psychiatrist in her office, divulged to me that in a weekly joint conference had between her, her MHU minions and Collins security officials, **"they admitted you probably shouldn't be here"** – *at least* an implicit acknowledgment of the abuse I was subjected to by staff the previous time I was at Collins, the present time, *and* the profound impropriety of my return.

284. Nevertheless, MHU Chief Ms. Garland declined to advocate for me to ask they either (1) rescind the phony MBRs and cease further abuse against me, and/or (2) transfer me elsewhere.

284. However, in response to my Feb. 8 letter to her simply asking if she was willing to write a letter to the Parole Board recommending my release in which I also paid her a respectful compliment *in the context of my request* ("While it is true that I write and speak well, in this status-driven society a letter from an accomplished, elegant and beautiful <u>MHU Chief</u> would have <u>far</u> more impact than <u>anything</u> I could ever say.") – in which I also solely related my crime conviction – she wrote me an MBR falsely for "Harassment, Stalking & Solicitation" and claimed I related *"personal information"* to her.

285. The MBR was also incredibly made a Tier III, and I again had the hearing before CHO Martin; my reading of the entire letter (1 page) and point that I had simply used minimal and respectful flattery in the hope of eliciting a release recommendation letter from Ms. Garland, thereby *precluding* any possible intent to 'harass' her, was conveniently ignored by CHO Martin.

286. Likewise, my citation of <u>Victory v. Pataki</u>, reflecting that convicted cop-killer and prison escapee sought (and *received*) release recommendation letters from six (6) correction officers – and thus my similarly contextual request from Ms. Garland could not possibly be an improper 'solicitation' – was also ignored.

287. Finally, my argument that the absence of any language from my letter implying that she was obligated to so write such a letter or that I would *continue* to seek such from her – and that my sole inclusion of my own crime information could not be deemed "personal information" – could not constitute stalking, solicitation or harassment, was also obtusely dismissed to find me guilty.

288. SHU Director Venettozzi, as always, ignored these fundamental evidentiary deficiencies, assuming he actually reviewed the hearing tape and my incisive appeal; his inevitable fraud of a denial – as with every other that he has issued in prior decisions – was devoid of *any* factual or legal analysis.

289. However, it was ironically MHU Chief Ms. Garland *herself* who relented and both verbally and via action revealed her MBR was improper and baseless; in response to 2 *more* letters to her pointing out the above and the conundrum arising from her refusal to advocate for me in the face of evidence I was being repeatedly falsely accused and abused by security (obviously injurious to my mental health), as opposed to then thereafter infracting me for asking her to simply advocate for my release, she expressed remorse to me and apologized during my next in-office session with her – then immediately thereafter arranged for the transfer she should have sought months earlier.

E. After My Transfer to G.M.C.F., My Colorable Challenges to the CR Date Withdrawal and Phony MBRs Were Obtusely Denied By Prison and Central Office and J. Geraci, But Not By April Board

290. On March 19, '19, on what was my original C.R. Date, I arrived at Great Meadow C.F..

291. In December '18 my appeal of the Collins TAC's decision (finalized at facility level by Supt. Thompson) to rescind my C.R. Date and *all* of my good time was upheld by SHU Director Venettozzi, **despite his *already* having been maintained as a Defendant in <u>Bonano v. Sheahan, et al.</u> earlier in 2018 following docketing decision for violating my due process rights in *prior* misbehavior-related proceedings** – an inherent conflict of interest and revealing further bias.

292. Said determination was in complete defiance of not only my *actual* prison programming efforts (I had not once refused any of approximately a dozen programs and with the exception of one at Collins CF [falsely], staff evaluations always commended me) and the numerous "fabricated" MBRs (supra, Att'y Greenberg's March 23, '18 letter to me) – including those manufactured by Collins C.F. itself as reflected in security officials' admission to MHU Chief Garland (supra).

293. Moreover, Collins' and DOCCS's determinations completely contradicted the precedent and standard of <u>Amato v. Ward</u>, 1977, N.Y. State Court of Appeals, wherein prisoner plaintiff – to whom I compared overwhelmingly favorably – was serving a 5 to 10 term for **a homicide**, had several "altercations with [prison] authorities" and whose institutional record was "terrible throughout".

294. Yet with all of that against him, he was simply denied 8 months out of the 40 months of total good time he was eligible for, whereas I was denied 5 years of good time though only a total of 8 months of loss of good time had ever been recommended arising from Tier III dispositions (*aside* from their falsity) – also contrary to 7 NYCRR Chapter 5, Section 255.

295. I included these facts and laws in my TAC denial appeal, in letters to Comm. Annucci (including my Nov. 14, '18 complaint about that day's TAC 'hearing' farce) and GMCF executives.

296. I also included most of these facts within a civil rights complaint (<u>Bonano v. Costello</u>) *and* related federal habeas corpus (<u>Bonano v. Thompson</u>), but this court's Chief Judge, Frank p. Geraci, who has thus far selected *himself* to preside over all three (3) of my filings submitted thereto, refused to hold an injunctive hearing or a habeas corpus Rule 8 hearing despite derisively commenting **"So it's a big conspiracy."** in his initial docketing decision on the <u>Costello</u> action.

297. Of course his elitist taunt connoted that (1) someone completely devoid of financial, social and professional status such as myself – regardless of my writing and analytical skills – 'could not possibly' be worthy of being conspired against by high-level law enforcement, court and prison officials; and/or (2) such officials, *all* Caucasian (and almost certainly Masons) are somehow *'incapable'* of acting conspiratorially and so deviously against this Latino felon - yet further and completely contradicted his fraudulent claim that the <u>Costello</u> complaint was 'unintelligible'.

298. In that docketing decision, Geraci *also* fraudulently distorted, misrepresented and misidentified sets of factual allegations and consequent legal implications emanating therefrom to falsely <u>imply</u> I had not stated a claim (as he also whined that the allegations were "non-linear" as *if* state officials perpetrate conspiracies and constitutional abuses in a manner purely chronological and readily perceivable and relatable); although he (again inconsistently) provided me a deadline by which to compile and file an amended petition, he did so with no heed to the tremendous amount of abuse, turmoil and upheaval I was being subjected to simultaneously (despite my letters relating to him my cell confinement, denials of law library access, and subsequent June 27 release from prison with but $40 and undomiciled) – finally but hastily dismissing it July 28, 2019.

299. These intentional injustices perpetuated my false but continuing imprisonment caused by the collective of above-referenced and named bad state actors for a few more months; had it not been for the 3 April 16, 2019 Parole Board Commissioners' decision to set me free (as of June 27, '19) – a

decision following a 45 minute interview in which much of the above was inquired of by them (esp.

the nine **[9]** Tier III guilty MBR dispositions against me within the 120-day period from Oct. '18 to

Feb. '19) and therefore inarguably renders said MBRs as having been malicious frauds – I would

still be in prison (although DOCCS and/or GMCF "dismissed" said 9 phony MBR guilty dispositions

thereafter, that was not done until May 22, '19).

300. Finally, please note I grieved **all of the above abuses and acts of misconduct by all of the**

**above bad actors** (except J. Geraci, an exercise in futility in light of the 2nd Circuit's constant

coddling of judges); however, in the prison context, the Grievance Directors of Elmira C.F. (Misty L.

O'Dell), Five Points C.F. (Mandi Schultz), and Collins C.F. prisons, as well as DOCCS Grievance

Directors Karen Bellamy and (then) J. MATTOZZI ; had each of them actually administered the filing,

processing and investigating as *theoretically* mandated by DOCCS regulations and basic concepts of

due process, I would have been released <u>many</u> months ago – but they instead buried many of my

grievances and had or allowed employees assigned to investigate them intentionally undermine my

complaints in the 'one-for-all and all-for-one' credo so reminiscent of the Masonic Order doctrine,

against this Latino prisoner, by a DOCCS personnel force approximately 96% Caucasian.

ON THIS FRIDAY, FEB. 14, 2020, I, MICHAEL BONANO, DECLARE THE
FOREGOING TRUE, UNDER PENALTY OF PERJURY, UNDER U.S. LAW,

TRUTHFULLY,

March 4, 2020

To: Clerk's Office, Att'n: Lisa & Tricia
    U.S. District Court, W.D.N.Y.
    2120 Kenneth B. Keating Fed. Bldg.
    100 State Street  Rochester, N.Y. 14614

              From: Michael Bonano
                     16 Congress Drive
                     Washingtonville, N.Y. 10992

Re: *Again* Submitting this **R.I.C.O. Civil Lawsuit**, and Again Submitting the Identical Accompanying
    Portions *Mirroring* the Court's Complaint Form – Except This Time Including the Form Itself;
    <u>Bonano, et al., v. Hickey, et al.</u>

Pursuant to 28 USC 1746, I, Michael Bonano, declare following true, under penalty of perjury:

Dear Clerks/Ladies,

    I have filled out the Civil 'Suit Complaint Form which you provided me "in the Non-prisoner context", though it consists of *the same* information that I had already set forth within purely typed pages that mirrored the sections of the "prisoner complaint", including numerical and labeling designations. I did not submit the actual form because I am not and have not been a prisoner since June 27, 2019 – although the acts complained of were committed by numerous bad state actors against me *as* I was in prison (from Feb. 17, 2017 through and until my June 27, 2019 release).

    However, I notice you provided me the form normally used for a 42 USC 1983 civil rights complaint (though 'in non-prisoner context'), as well as a federal habeas corpus form. I assume I may use the former form for a R.I.C.O. 'suit – which this is. Numerous collaborative acts were engaged in by *many* sets of state actors in the course of prison, parole and court proceedings that involved **numerous instances of wire fraud, as reflected in official documents, and, moreover, Transcripts (prison misbehavior, parole *and* court), as well as in e-mail communications and via phone calls**. I have all of them, with the exception of the phone calls, all made electronically.

    It started with the despicable A.A.G. Ryan W. Hickey who collaborated with DOCCS, O.S.I. and Elmira C.F. officials to suspend my Feb. 21, 2017 prison release on a maliciously false basis – and almost certainly had contact(s) (whether phone, e-mail and/or letter) with one or more of the members of the other sets of a stunning series of conspiracies and acts designed to thwart my release during a 28 month period and prolong my false imprisonment to also destroy and damage my economic prospects. This places this complaint squarely within the R.I.C.O. statutes.

    However, the R.I.C.O. statutes and their applications explicitly call for the invocation of any and all other statutes thereby violated by the illegal enterprise's state actor participants; this includes all federal criminal and civil statutes as well as their state equivalents. This would therefore also encompass 42 USC sections 1981-1986, the habeas statutes (28 USC 2241 & 2254), *and* the R.I.C.O. statutes (18 USC sections 1961, et seq.), as well as the 18 USC 241 & 242 criminal statutes and state laws.

    Finally, please note I initially compiled all of this (minus the form you just provided me) on Feb. 15 and submitted it on Feb. 19, 2020, via next-day express mail – which you returned to me last week  (Feb. 25, received Feb. 27), so this should be considered part of the same submission. *If there is a specific form or other filing requirement to finalize this **RICO filing**, please inform and provide.*
*AND PLEASE, <u>WITHOUT</u> RETURNING ENTIRETY/REMAINDER OF THIS LARGE MAILING.*

*ON THIS WEDNESDAY, MARCH 4, 2020, I, MICHAEL BONANO, DECLARE*
*FOREGOING TRUE, UNDER PENALTY OF PERJURY, UNDER U.S. LAW.*  *TRUTHFULLY*

USDC-NY
FEB 21 2020
ROCHESTER

20 CV 6141 FPG

JS 44  (Rev. 08/16)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

**I. (a) PLAINTIFFS** *MICHAEL BONAND, ET AL.*

**DEFENDANTS** *RYAN W. HICKEY, ET AL.*

**(b)** County of Residence of First Listed Plaintiff *ORANGE*
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant *ALBANY*
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)* *PRO SE*
*(845) 636-6486*

Attorneys *(If Known)* ?

**II. BASIS OF JURISDICTION** *(Place an "X" in One Box Only)*

☐ 1  U.S. Government
     Plaintiff

☐ 2  U.S. Government
     Defendant

☑ 3  Federal Question
     *(U.S. Government Not a Party)*

☐ 4  Diversity
     *(Indicate Citizenship of Parties in Item III)*

**III. CITIZENSHIP OF PRINCIPAL PARTIES** *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*                        *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☑ 1 | ☑ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** *(Place an "X" in One Box Only)*                                        Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | Pharmaceutical Personal Injury | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | Product Liability | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | | ☐ 840 Trademark | ☐ 460 Deportation |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | **LABOR** | **SOCIAL SECURITY** | ☑ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 480 Consumer Credit |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 720 Labor/Management Relations | ☐ 862 Black Lung (923) | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 740 Railway Labor Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 196 Franchise | | | ☐ 751 Family and Medical Leave Act | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | ☐ 791 Employee Retirement Income Security Act | | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 896 Arbitration |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 950 Constitutionality of State Statutes |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

**V. ORIGIN** *(Place an "X" in One Box Only)*

☑ 1 Original
     Proceeding

☐ 2 Removed from
     State Court

☐ 3 Remanded from
     Appellate Court

☐ 4 Reinstated or
     Reopened

☐ 5 Transferred from
     Another District
     *(specify)*

☐ 6 Multidistrict
     Litigation -
     Transfer

☐ 8 Multidistrict
     Litigation -
     Direct File

**VI. CAUSE OF ACTION**
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
*18 U.S.C. § 1961, ET SEQ.   42 U.S.C. § 1981 - § 1986; ALSO N.Y. STATE LAW*
Brief description of cause:

**VII. REQUESTED IN COMPLAINT:**
☐ CHECK IF THIS IS A CLASS ACTION
   UNDER RULE 23, F.R.Cv.P.

DEMAND $ *33 MILLION*

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☑ Yes   ☐ No

**VIII. RELATED CASE(S) IF ANY**
*(See instructions):*
JUDGE _____   DOCKET NUMBER _____

DATE *FEB. 14. 2020*

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT #          AMOUNT          APPLYING IFP          JUDGE          MAG. JUDGE